27 N.J. Super. 537 (1953)
99 A.2d 820
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ADOLPH JOSEPH SALERNITANO AND ANTHONY ROCCO LIGORI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1953.
Decided October 15, 1953.
*539 Before Judges EASTWOOD, JAYNE and FRANCIS.
Mr. H. Russell Morss, Jr., County Prosecutor of Union County, argued the cause for the plaintiff-respondent.
Mr. William Osterweill argued the cause for the defendants-appellants (Mr. Leon J. Lavigne, attorney; Mr. Jacob Levine, on the brief).
The opinion of the court was delivered by EASTWOOD, S.J.A.D.
The defendants were convicted upon an indictment charging them with the possession of burglar's tools, proscribed by the provisions of N.J.S. 2A:94-3, and they appeal from the ensuing judgment.
The essential facts are that Police Officer Edward L. Zirkel, a member of the City of Elizabeth Police Department, at about 11:00 o'clock on the night of June 26, 1952, was checking doors "along from Commerce Place down Grand *540 Street as far as Jefferson Avenue," when his attention was attracted to three men walking toward him through a parking lot; he took a position in a darkened area; the men walked past him at a distance of 10 or 15 feet and stopped to engage in conversation with each other. At that point, they were eight or ten feet on the far side of the first set of railroad tracks, while Zirkel was on the near side of the tracks in the vicinity of a darkened crane. The only words of the conversation that Officer Zirkel could distinctly hear were "the beef house." Grand Street, approximately 200 feet from the railroad tracks, runs parallel thereto in an easterly and westerly direction. Commerce Place extends from east Grand Street a distance of 150 feet before merging with the railroad right of way. The Commerce Place parking lot is on the court house side of the railroad tracks, while the "beef house" is located on the other side of the tracks.
One of the trio then proceeded across the tracks towards the "beef house," while the two defendants went towards Commerce Place. Officer Zirkel waited about ten minutes, then crossed the tracks towards the "beef house," when suddenly he came upon the defendants in the dark, whereupon he directed his flashlight at them. At that time Zirkel was traversing the tracks towards Chestnut Street and the two defendants were proceeding down the tracks in the direction of the "Port" alongside the "beef house" on the far side of the tracks. Zirkel informed them they were under arrest and discovered that the defendant Ligori had a jimmy in his left hand; he observed a sledge hammer, a chisel and a mismated pair of canvas gloves on the ground about three feet from Salernitano's feet, and black gloves at Ligori's feet. Salernitano informed Zirkel that he had a flashlight in his pocket, which was delivered to Zirkel later.
After Zirkel had sent for the patrol wagon, he returned to the scene of the apprehension of the defendants and recovered the other articles which he had previously observed on the ground.
Defendant Ligori informed the police that they could locate their automobile in a parking lot on Commerce Place, *541 which was about 1,000 feet from the "beef house." Upon an examination thereof, Detective Matiunas and Officer Zirkel discovered a small cold chisel, two small crowbars and a white and yellow canvas glove. Prior to examining the automobile Detective Matiunas engaged in conversation with the defendant Ligori, who stated that he was at the scene of his arrest as the result of a rendezvous with a "colored girl" whom he had met at a tavern and had selected the back of the "beef house" as the place of assignation.
After Officer Zirkel and Detective Matiunas had returned to headquarters from their investigation of the automobile they again questioned the defendants, whereupon they gave conflicting stories as to their activities of the evening. The defendant Ligori stated that the tools found in his car were kept there in the event it was ever necessary to change a tire, but Ligori changed this story several days later when he said that he had been unable to get a plumber and that he was trying to repair his boiler. The white and yellow canvas glove found in the automobile matched the odd glove found at the scene of the defendants' arrest.
Detective Matiunas, who testified as an expert on burglar's tools, expressed the opinion that the tools found upon the defendants and at the scene of their arrest were "burglar's tools" conceding, however, that they could be used for other purposes. Although the articles found in the automobile were not admitted in evidence, on the ground that they were not set forth in the indictment, Detective Matiunas was permitted to testify, without objection, regarding their presence in the automobile used by the defendants on that occasion.
Neither of the defendants took the stand nor did they offer any witnesses in their behalf.
The only ground of appeal relied upon by the defendants is that the State did not prove a prima facie case of criminal intent and, therefore, the trial court erred in refusing to grant the defendants' motion for a judgment of acquittal.
For a clear understanding of the statute upon which the *542 indictment and conviction of the defendants are grounded, we quote the following provisions thereof:
"Any person who manufactures or knowingly possesses any engine, machine, tool or implement adapted or designed for cutting through, forcing or breaking open any building, room, vault, safe or other depository, in order to steal therefrom any money or other property, knowing the same to be adapted or designed for such purpose, with intent to use or employ or allow the same to be used or employed for that purpose, is guilty of a high misdemeanor." N.J.S. 2A:94-3 (formerly R.S. 2:115-5).
An examination of the statute clearly discloses that to support a conviction for the violation thereof, the State must bear the burden of proving beyond a reasonable doubt the three following elements of the offense: (1) adaptation and design of the tool or implement for breaking and entering; (2) possession thereof by one with knowledge of its character; and (3) intent to use or employ such tool or implement or allow the same to be used or employed for the interdicted purpose.
Following the enumeration of the tools is the phrase "adapted or designed for cutting through, forcing or breaking open any building," etc. This adjective phrase qualifies all the preceding nouns naming "engine, machine, tool or implement." Otherwise, it would be a crime under the statute to make, design, set up, possess or have any such tool. Under the maxim noscitur a sociis this construction is further borne out by the fact that the tools and devices specifically enumerated in the statute are of a character adapted, designed and commonly used for breaking into structures named in the statute.
It follows that the possession of tools, instruments, or devices not so adapted, designed or commonly used does not subject the possessor to prosecution under the statute. State v. Hyde, 297 Mo. 213, 248 S.W. 920, 922 (Sup. Ct. 1923); State of Missouri v. Hefflin, 338 Mo. 236, 89 S.W.2d 938, 103 A.L.R. 1308 (Sup. Ct. 1935). There is no express provision in the statute that possession upon one's person is an essential element of the crime. Accordingly, the possession may be actual or constructive. Two persons *543 may have constructive possession, or one may have actual possession and the other constructive possession. Commonwealth v. Segers, 167 Pa. Super. 642, 76 A.2d 483 (Super. Ct. 1950); 12 C.J.S., Burglary, § 69, p. 754; 9 Am. Jur., Burglary, § 86, p. 281.
That the tools or implements were originally not made or intended for an unlawful use is not a controlling factor. The test is whether they are suitable for the purpose of breaking and entering burglariously; it is immaterial that they are also designed and adapted for honest and lawful purposes. On the other hand, the mere possession of tools, instruments or devices not adapted, designed or commonly used in breaking into buildings, etc., is not sufficient to subject the possessor to prosecution. A leading case on the subject is Commonwealth v. Tivnon, 8 Gray (74 Mass.) 375, 380, 69 Am. Dec. 248, 251 (Sup. Jud. Ct. 1857), where it was said:
"Nor do we think it necessary, in order to create the offence which the statute is designed to punish, that it should appear that the tools or implements were originally made or intended for an unlawful use. If they are suitable for the purpose, so that they can be used to break and enter burglariously, it is wholly immaterial that they were also designed and adapted for honest and lawful use. A chisel or centrebit, though a tool in common use for ordinary purposes, is quite as efficacious in the hands of a burglar to carry out his felonious intent, as a jimmy or a lockpicker, which is made for the sole purpose of being used to break and enter buildings."
See also Commonwealth v. Riley, 192 Ky. 153, 232 S.W. 630, 632 (Ct. App. 1921); State v. Widenski, 50 R.I. 148, 146 A. 407 (Sup. Ct. 1929); State v. Fitzpatrick, 141 Wash. 638, 251 P. 875 (Sup. Ct. 1927); O'Neill v. State, 105 Neb. 824, 182 N.W. 503 (Sup. Ct. 1921); State v. Ferrone, 97 Conn. 258, 116 A. 336 (Sup. Ct. Err. 1922); People v. Morgan, 59 Hun. 619, 13 N.Y.S. 448 (Sup. Ct. 1891).
To sustain a conviction it necessarily follows that there must be proof not only that the tools or implements are adapted and designed for breaking and entering but also *544 proof of the possession thereof by the accused with knowledge of their character. But the question of the good or bad intent of the possessor of the tools banned by the statute is material in a prosecution thereunder. It cannot be said that the statute brands as a criminal every carpenter or mechanic who carries with him the implements of his trade, or every motorist who goes about with an ordinary tool kit in his automobile. Hammers, saws, chisels, braces and bits, drills, screw drivers, crowbars and punches obviously would be discovered in one or all of such kits, and would be implements adapted, designed or commonly used in breaking into houses, etc. They would, therefore, come within the literal terms of the statute. In considering the harshness of a contrary construction, the State must bear the burden of proving beyond a reasonable doubt that the possession of the tools by the accused must be with the general intent that they will be used for a burglarious purpose. 9 Am. Jur., Burglary, sec. 86, supra.
Criminal intent may be shown by circumstantial evidence. People v. Beacham, 358 Ill. 373, 193 N.E. 205 (Sup. Ct. 1934); People v. McLaughlin, 337 Ill. 259, 169 N.E. 206 (Sup. Ct. 1929); People v. Yuskauskas, 268 Ill. 328, 109 N.E. 319 (Sup. Ct. 1915); Dahlberg v. People, 225 Ill. 485, 80 N.E. 310 (Sup. Ct. 1907); McCoy v. People, 175 Ill. 224, 51 N.E. 777 (Sup. Ct. 1898); Crosby v. People, 137 Ill. 325, 27 N.E. 49 (Sup. Ct. 1891); People v. Buskievich, 330 Ill. 532, 162 N.E. 196 (Sup. Ct. 1928); People v. Weiss, 367 Ill. 580, 12 N.E.2d 652, 655 (Sup. Ct. 1937); People v. Taylor, 410 Ill. 469, 102 N.E.2d 529 (Sup. Ct. 1951). The question of proof of intent was discussed in the case of State v. Walsh, 9 N.J. Super. 43, 46 (App. Div. 1950), wherein Judge McGeehan, speaking for the court, stated:
"An essential element of the crime is the intent to use or employ the tool or implement, or to allow the same to be used or employed for cutting through, forcing or breaking open any building, room, etc., in order to steal therefrom any money or property. When specific intent is an essential element of the crime charged, the *545 burden is on the State to prove such intent. This burden may be met by direct proof or by circumstantial evidence. Underhill, Criminal Evidence, § 54 (4th ed. 1935); 22 C.J.S., Criminal Law, § 568; 14 Am. Jur., Criminal Law, § 24, n. 19. There must be proof, at least, of some circumstance or circumstances, in addition to the proof of the possession of the tool itself, from which the jury could draw a legitimate inference of the required intent. Here there was neither direct proof nor proof of any such circumstance or circumstances. Cf. 103 A.L.R. 1313, 1316."
The defendants contend that the State failed to bear the burden imposed upon it of proving beyond a reasonable doubt the "essential element of the crime (i.e.) the intent to use or employ the tool or implement, or to allow the same to be used or employed for cutting through, forcing or breaking open any building, room, etc., in order to steal therefrom any money or property." It is incumbent upon us, therefore, to scrutinize the record to determine whether there was sufficient evidence to justify the finding that the defendants possessed the tools with intent to use them for a burglarious purpose.
When a motion for directed acquittal is made, the test is whether there is any evidence from which an inference of guilt may be drawn. State v. Fox, 12 N.J. Super. 132 (App. Div. 1951). A judgment of acquittal should be denied where there is evidence of guilt which, if believed by the jury, would justify a guilty verdict. State v. Sgro, 108 N.J.L. 528 (E. & A. 1932); State v. Cammarata, 12 N.J. Misc. 115 (Sup. Ct. 1934); State v. De Falco, 8 N.J. Super. 295 (App. Div. 1950); State v. Carbone, 17 N.J. Super. 446, 453 (App. Div. 1952), affirmed 10 N.J. 329 (1952).
In support of their position, the defendants rely upon the case of State v. Walsh, supra. In fact, it is the only case cited by the defendants to bolster their argument. The Walsh case is clearly distinguishable from the case sub judice. In that case, Walsh was apprehended while walking on a public sidewalk at 7:50 P.M., and at the request of the arresting officers told them correctly where Algonquin Place was, but he refused to tell them who he was, where he was *546 going and what he was doing. Upon searching him, they found in the outside pocket of his overcoat two cotton gloves, a jimmy inside one of the gloves, a small flashlight and a small mirror, a slip of paper with certain numbers upon it, identified at the trial as catalog numbers for a revolver, a receipt for a room in a New York hotel, three $100 bills and other cash, totalling $369.42. On the basis of the foregoing proofs, the Appellate Division reversed Walsh's conviction, holding that in addition to the proof of the possession of the jimmy, there must be proof of some circumstance or circumstances from which the jury could draw a legitimate inference of the required intent.
Our review of the record of the present case discloses that the State's proofs met the requirements of the rule enunciated in State v. Walsh. In the Walsh case, there was only one burglar's tool in the defendant's possession, whereas in the present case, the evidence supports the finding that the sledge hammer, jimmy and chisel, all were seized in the possession of the defendants. Walsh was found walking on a public sidewalk at 7:50 P.M., whereas the defendants were trespassing on private property in a rather dark and secluded place, at about 11:00 P.M., within approximately 100 feet of a "beef house," mentioned by one of the three men (two of whom were identified by Officer Zirkel) when Zirkel had them under surveillance. In view of the defendants' denial of any connection with the articles found on the ground, much significance must be given to the odd glove found in the defendants' automobile, in that it was the mate of the other glove found at the scene of the arrest. While the gloves and flashlight may not be considered as tools adapted or designed for use in breaking and entering, we think that in view of the "burglar's tools" found in the defendants' possession, the jury could properly consider them as bearing on the question of intent. State v. Widenski, supra; State v. Hefflin, 338 Mo. 236, 89 S.W.2d 938, 103 A.L.R. 1301 (Sup. Ct. 1935); People v. Taylor, supra. Additionally, the defendants told conflicting stories concerning their presence at the place of arrest.
*547 It is our considered opinion that there was sufficient competent evidence to warrant the denial of the motion to acquit and to support the jury's verdict.
Affirmed.