37 P.3d 572

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Bryan E. BROWN, aka Bryan E. Johnson, Defendant–Appellant.**

**No. 23601.**

Intermediate Court of Appeals of Hawai'i.

Nov. 21, 2001.

Jon N. Ikenaga, Deputy Public Defender, State of Hawai'i, on the brief, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief, for plaintiff-appellee.

WATANABE, Acting Chief Judge, LIM, and FOLEY, JJ.

Opinion of the Court by WATANABE, Acting Chief Judge.

As a result of a series of events that ended with a high-speed police chase of a white Ford van on November 14, 1999, Defendant–Appellant Bryan E. Brown, also known as Bryan E. Johnson, (Brown) was arrested for, and subsequently found guilty by a jury of: (1) Unauthorized Control of Propelled Vehicle, in violation of Hawaii Revised Statutes (HRS) § 708–836 (1993 & Supp.2000) [1]; (2) Driving without License, in violation of HRS § 286–102 (1993 & Supp.2000) [2]; (3) Posses-

[1]. Hawaii Revised Statutes (HRS) § 708–836 (1993 & Supp.2000) provides, in relevant part:

**Unauthorized control of propelled vehicle.** (1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.

(2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

(3) It is an affirmative defense to a prosecution under this section that the defendant:

(a) Received authorization to use the vehicle from an agent of the owner where the agent had actual or apparent authority to authorize such use; or

(b) Is a lien holder or legal owner of the propelled vehicle, or an authorized agent of the lien holder or legal owner, engaged in the lawful repossession of the propelled vehicle.

(4) For the purposes of this section, "owner" means the registered owner of the propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership.

(5) Unauthorized control of a propelled vehicle is a class C felony.

[2]. HRS § 286–102 (1993 & Supp.2000) provides, in relevant part:

**Licensing.** (a) No person, except one exempted under section 286–105, one who holds an instruction permit under section 286–110, one who holds a commercial driver's license issued under section 286–239, or a commercial driver's license instruction permit issued under section 286–236, shall operate any category of motor vehicles listed in this section without first being appropriately examined and duly

sion of Burglar's Tools, in violation of HRS § 708–812(1)(a) (1993); and (4) Turning at Intersections, in violation of HRS § 291C–81(2) (1993).[3]

In this appeal from the judgment of the Circuit Court of the First Circuit,[4] entered pursuant to the jury verdict on June 20, 2000, Brown contends that: (1) his convictions on Counts 1, 2, and 4 must be reversed because Plaintiff–Appellee State of Hawai'i (the State) failed to adduce substantial evidence that he was the driver of the van in question; and (2) his conviction on Count 3 must be reversed because the State failed to adduce substantial evidence that he "constructively possessed the burglar's tools" that were found in a backpack on the floorboard near the front passenger's seat of the van.

For the reasons discussed below, we affirm Brown's convictions and sentences as to all counts.

## BACKGROUND

Because this is an insufficiency of the evidence appeal, we briefly summarize the evidence relevant to the issues raised by Brown that was adduced at trial.

### A. The State's Evidence

#### 1. Gregory Paul Ascino, Jr. (Ascino)

The first witness to testify at the trial below was Ascino, a delivery driver for Norpac Fisheries (NF). He testified that NF owned three delivery vehicles—"two Ford vans and one Ford flat bed [sic] truck."[5] One of the NF vans was white, with license plate No. 870 TND (white van or van), and it had two front doors (for the driver and the passenger), a side door (with two double doors), and a back door (with two double doors). The white van had two bucket seats, and the console between the seats was connected to the dashboard, making it difficult for anyone to sit on the console.

According to Ascino, NF employed two other delivery drivers—Edel Paguirigen (Edel) and Gus. There were two sets of keys to the NF vehicles. One set was kept in a downstairs office desk drawer and was used by the three drivers. This drawer was kept unlocked at all times. The other set of keys was kept in the upstairs office.

Ascino testified that on the morning of November 12, 1999, Edel drove the white van, the vehicle involved in this case. When Ascino returned to the NF office after his last delivery at approximately 3:00 p.m., he noticed that the white van was in the parking lot. Ascino explained that "at the end of the day each driver puts the keys [to the vehicle he drove that day] on the [downstairs] desk. The last one to leave puts it [sic] in the [downstairs desk] drawer." On that day, since Ascino was the last to leave, he put three sets of keys in the drawer. Ascino then left, without checking to see if the vans were locked.

licensed as a qualified driver of that category of motor vehicles.
 (b) A person operating the following category or combination of categories of motor vehicles shall be examined as provided in section 286–108 and duly licensed by the examiner of drivers:
 . . . .
 (3) Passenger cars of any gross vehicle weight rating, ... and vans having a gross vehicle weight rating of fifteen thousand pounds or less[.]

3. HRS § 291C–81 (1993) provides, in relevant part, as follows:
 **Required position and method of turning at intersections.** The driver of a vehicle intending to turn at an intersection shall do so as follows:
 . . . .
 (2) Left turns. The driver of a vehicle intending to turn left at any intersection shall approach the intersection in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of such vehicle, and, after entering the intersection, the left turn shall be made so as to leave the intersection in a lane lawfully available to traffic moving in such direction upon the roadway being entered. Whenever practicable the left turn shall be made in that portion of the intersection to the left of the center of the intersection.

4. The Honorable Sandra A. Simms presided over the jury trial.

5. The testimony at trial revealed that on November 12, 1999, the Ford flatbed truck was being repaired and Norpac Fisheries had the use of a rental van.

The next morning, Ascino arrived at work at approximately 7:30 a.m. He proceeded to prepare for delivery and then discovered that the white van was missing. He immediately called his supervisor, Darrell Puu (Puu), to ask him where the van was.

## 2. Edel Pagnirigen

Edel, also an NF delivery employee, testified that he worked on November 12, 1999 and made his deliveries using the white van. He returned from his deliveries at approximately 2:45 p.m., parked the white van in the NF parking lot, and left the keys in the back of the white van because it was "much too early." Edel then went "inside" to "help pack" and eventually left work at around 4:00 p.m. When he left work, he noticed that the white van was still in the parking lot. Edel's testimony was a bit confusing as to whether Edel ever brought the keys to the white van into the office before leaving work, or just left them in the van. On one hand, Edel testified that after he brought the van back, he did not take the keys out of the van but went to help pack. However, he also testified that his usual practice after he brought a van back was to clean it out and then place the keys on top of the downstairs desk drawer.

## 3. Darrell Puu

Puu, NF's operations manager, testified that between November 12 and 14, 1999, NF owned a white Ford van, license plate No. 870 TND and Vehicle Identification No. 1FTJS34S6RHA6026S. The van had a large pink, green, and silver company logo on both of its sides. On November 12, 1999, when Puu left work at approximately 3:30 p.m., he noticed that the white van was parked in the parking lot.

The following day, Ascino informed him at approximately 7:45 a.m. that the white van was missing. Puu proceeded to contact all his employees "to make sure nobody else had the van." He also checked the "base yard" and then the parking lots on both sides" but could not find the white van. When he subsequently learned that the set of keys to the white van (but not those to the other NF vehicles) was missing from the downstairs desk drawer, he called the police to report the van missing.

Puu testified that the following day, November 14, 1999, the police contacted him and asked him to go to Wahiawā to recover the missing van. When he went to recover the van, he noticed that the company logos on the sides of the van had been "painted over with [white] spray paint." Furthermore, the front of the van was "smashed in[,]" and inside the van, there was plywood that appeared to be pushing the seats forward toward the dashboard. The missing keys were also found inside the van.

Puu further testified that he did not know Brown, Brown was not an employee of NF, and NF did not give Brown permission to operate the van on November 14, 1999.

## 4. Lt. Jose Gaytan (Lt.Gaytan)

Lt. Gaytan, a Honolulu Police Department lieutenant with approximately twenty years' experience, was the State's next witness. Lt. Gaytan testified that on November 14, 1999, at approximately 5:00 a.m., he was on duty conducting a solo routine patrol of the open businesses in the Mililani Shopping Center area. His "curiosity was aroused" when he approached Island Mini Mart (mini mart), a convenience store with open gas pumps, located near the shopping center.

Lt. Gaytan explained that there are two aisles of gas pumps in front of the store and three main big lanes that provide access to the pumps. The first lane is closest to the store, the middle lane is between the two aisles of gas pumps and is wide enough for two rows of cars, and the third lane is located on "the outer most side away from the store." (In other words, there were four vehicle lanes, which will hereafter be referred to as Lanes 1, 2, 3, and 4, with Lane 1 being the lane closest to the store and Lane 4 being the lane farthest from the store.) The lanes run parallel to the store with arrows directing the flow of traffic in one direction.

Lt. Gaytan testified that, generally, when he patrolled that particular mini mart, he drove "closest to the store meaning [Lane 1]. And, if there's nothing out of the ordinary, I try to make eye contact with the clerk[;] that

way I know things are okay, [and] I can go on and check on other things." That morning, when he arrived at the mini mart, there was a lone white van parked in Lane 1, "facing in the wrong direction" from the arrows. This aroused his curiosity, so he drove through Lane 3 so he could have a "good field of vision of the front glass doors of the convenience store."

Lt. Gaytan stated that as soon as he came into view of the front doors, he saw a male, whom he identified as Brown in the courtroom, exit the front door of the mini mart. According to Lt. Gaytan, the male "came around the front of the van and then he . . . opened the door and got in the driver's side of the van." Because the driver's side of the white van was closer to the gas lanes than to the store, Lt. Gaytan had an "unobstructed" view of the driver's door. Moreover, the lighting was "very bright[,]" and the closest distance between himself and the male was about twelve feet.

Lt. Gaytan testified that when he saw the male come out of the store,

> number one, it struck me peculiar that the moment I came into view with my illuminated light that he happened to just exit. Number two, he kept looking at me. I don't know how to explain this. I've been a police officer. I know when somebody is looking at you [sic] might be something wrong. He's looking at you try to look away—the way he was moving, again, without any particular explanation on how I explain this, but, it appeared to me somebody trying to hurry or the same time trying to not to appear suspicious so hurrying.

Lt. Gaytan then attempted to turn his vehicle around to move into the same lane as the white van. Because he could not negotiate the turn completely, he backed up to see the white van's license plate, which was No. 669 TGV, and then "called into [sic] the dispatcher to see if [the van] was reported stolen or wanted." The information relayed from dispatch was that license plate No. 669 TGV belonged to a green Ford van.

According to Lt. Gaytan, "[a]s soon as the person, the male, got in the driver's side, the vehicle started moving[.]" As the van exited the mini mart onto Kīpapa Drive, Lt. Gaytan noticed the "silhouette" of a person on the "right side" through the rear windows. Lt. Gaytan then drove to the front of the store to make eye contact with the clerk and make sure "there was nothing wrong." When he did not see anything in the store to cause him alarm, he tried to follow the van to check on why a reportedly green van was now white; however, when he turned right onto Kīpapa Drive, the van had already left. Feeling uneasy about what he had just witnessed, Lt. Gaytan decided to check out another convenience store on Kīpapa Drive. He drove by, made contact with the clerk in that store, and, finding nothing wrong, decided to "just go on . . . back to . . . [Wahiawā] and [Kamehameha] Highway." While on Kamehameha Highway headed towards Wahiawā, he arrived at an intersection and noticed the white van "coming on [his] right side getting ready to make a right turn." Lt. Gaytan testified that since he was in the left lane of Kamehameha Highway at the time, he pulled into "the right lane as the [white van was] turning right." He then "slow[ed] down to a crawl and force[d the white van] to pass [him] on the left." Thereafter, he followed the van from "about three to four vehicle length[s] behind" as the van headed on Kamehameha Highway towards Wahiawā. Meanwhile, he called dispatch and learned that the safety check for the van had expired in July. As they reached Wahiawā, Lt. Gaytan followed close behind the white van in the center lane of three lanes on Kamehameha Highway and notified dispatch that he was going "to stop [the van] to check on the expired safety check."

Lt. Gaytan further stated that as the white van and his vehicle approached the intersection of Kamehameha Highway and California Avenue on a green light, the white van suddenly made a left turn onto California Avenue from the center lane. Since this was the wrong lane from which to make a left turn, Lt. Gaytan attempted to follow the van but was delayed by another vehicle coming toward him through the intersection. Lt. Gaytan activated his blue police light as the van made another left turn onto ʻŌhai Street at a "high speed[.]" By the time Lt. Gaytan

caught up with the white van, it had crashed into the wall of a residence.

According to Lt. Gaytan, when he arrived at the scene of the crash, both the "right front passenger['s] door and the driver's door were wide opened [sic]." Approaching the right passenger's door, he observed that there was nobody inside the van. Then, an "elderly gentleman" [6] came out of one of the residences "next to the wall ... where the van had hit" and pointed down the street, saying, "[O]ne of them [ran] that way." Another police officer then arrived, and he and Lt. Gaytan both went down the street to investigate. Although they checked all the houses nearby, the officers were unable to find anyone. Lt. Gaytan then heard on his police radio that "other officers that were at the [crash] scene were calling for an ambulance[,]" so he "went back to see who was injured[.]" When he returned to the scene, he was directed to "a man lying down [on his stomach] by the front of the van kind of hidden" and moaning. Lt. Gaytan identified this man as the same man he saw "coming out of the mini mart driving—getting into the driver's side, driving away earlier."

On cross-examination, Lt. Gaytan was reminded about his preliminary hearing testimony in which he described the person leaving the mini mart as "tall," about "five feet ten, five feet eleven[,]" and weighing about "a hundred eighty, possibly even two hundred pounds[.]" Lt. Gaytan also admitted that he never went back to the mini mart to show the store clerk a picture of Brown or to ask for the mini mart's security camera videotape that would have shown who entered the convenience store on the morning in question. Lt. Gaytan also agreed that he did not get the name or address of the elderly gentleman witness at the scene of the accident or attempt to interview him. On redirect examination, Lt. Gaytan explained that he did not go back to the mini mart to ask for the videotape or speak to the clerk because, in his opinion, such evidence was not relevant to a charge of Unauthorized Control of Propelled Vehicle. He also explained that he did

not attempt to get the name of the witness at the scene of the accident because he was not in charge of the investigation.

### 5. Officer Theodore Merrill (Officer Merrill)

Officer Merrill, the arresting officer, testified that when he arrived at the scene of the crash, he "noticed a white van stopped and collided into a wall" with both its driver's and passenger's doors wide open. Lt. Gaytan, who was already at the scene, mentioned that there had been two people in the van and "somebody in the yard or a yard close by to that residence where the van collided ... pointed south on Walker Avenue [and] said they saw somebody running that way[.]" Officer Merrill and Lt. Gaytan immediately went off to search for the suspect and, when the search proved unsuccessful, returned to the crash scene. At the crash scene, Officer Merrill observed Brown "laying on [the] ground at the front left corner of the van in front of the opened door." "[Brown] was laying on his left side with his head facing towards the van itself." Officer Merrill then proceeded to inspect the vehicle.

Officer Merrill further testified that he observed that the "driver's seat was pushed forward as far as it would go. And the seat back of the driver's seat was pushed forward slightly." Additionally, the driver's seat was approximately "12, 13 inches at the most" from the steering wheel, so it was difficult to get "in between the steering wheel and the front seat to look at the ignition." In contrast, Officer Merrill testified, the passenger's seat "looked rather normal[.]" Officer Merrill recalled that there were "35 sheets of plywood stacked up inside the cargo area of the van." The sheets of plywood were "four[-]by[-]eight[-]foot pieces" and "took up most of the cargo area of the van." Asked to describe how high the stack of plywood was in relation to the back of the driver's seat, Officer Merrill related that if an average person "were sitting in the driver's seat, the stacking of plywood would have come up to

**6.** On cross-examination, Lieutenant Jose Gaytan described the witness as a Japanese male, age

sixty to seventy, approximately 180 pounds.

probably ... [the person's] back right about the shoulder blade area[.]"

Officer Merrill mentioned that because he observed a key in the white van's ignition, he "force[d]" himself "to get in the driver's seat to click the key in the ignition." When the vehicle started, he concluded that the key "was obviously for that vehicle."

Following Officer Merrill's testimony, a certified copy of Brown's driver's license status, indicating that Brown did not have a license to drive on the date of the white van incident, was admitted into evidence.

On cross-examination, Officer Merrill admitted that he had testified at the preliminary hearing that witnesses at the crash scene had stated that they saw "one or two people running down the street[.]" Furthermore, he admitted that he did not "get any names of witnesses" although he "was initially in charge of gathering evidence for this particular investigation[.]"

### 6. Officer Terry Leach (Officer Leach)

Officer Leach testified that he was in his car on Kamehameha Highway in Wahiawā at about 5:15 a.m. on November 14, 1999, when he heard Lt. Gaytan communicate to police dispatch that "he was going to try to stop this white van that had taken off from him and gone down ['Ōhai] Street." After hearing this message, Officer Leach turned down Kamehameha Highway towards the beginning of Wahiawā and saw the white van "come out of ['Ōhai Street,] cross [Kamehameha] Highway going to Avocado Street." Officer Leach testified that he then "turned on to Olive [Avenue] to go to Walker [Avenue] because Avocado [Street] dead ends on Walker [Avenue]. [He] figured the van might come up that way." After turning onto Walker Avenue, he "turned down towards Avocado [Street] and ... saw [that] the van had hit a ... rock wall."

Officer Leach stated that he arrived at the crash scene at approximately the same time as Lt. Gaytan and noticed that both doors of the white van were open, the engine was running, and the lights were on. After a brief inspection of the van's interior, he noticed that the keys were in the ignition and the van was still in drive. He then "put the van in park, and, turned off the ignition" and stayed at the scene while Lt. Gaytan and Officer Merrill went down the street to search for suspects.

Officer Leach was then questioned about his observations regarding the interior of the van. He testified that there was a stack of plywood in the back of the van that "had shifted forward and hit the wall area." Also, the driver's seat "had been pushed forward by ... the plywood" and "[it] was kind of crooked, bent, I guess, when the plywood moved forward [and] pushed the seat up somehow." The passenger's seat, however, was "all right." He further testified that he saw Brown "[l]aying underneath the front of the van." Brown was injured, "[c]laimed his leg hurt[,]" and was "[i]n a lot of pain."

Officer Leach testified that prior to inspecting the van, he received information that the van had been "reported stolen." Upon checking the van, he found a "backpack on the floor board [sic] passenger side of the van." The backpack was open, and it had a pair of "bolt cutters sticking out." Searching the backpack, he found several "[l]ittle screw drivers [sic]" (regular head and Phillips), an ax, a pair of channel-lock pliers, and a hose. All of these items were subsequently admitted into evidence.

Officer Leach was then asked to explain how these items are "used with respect to burglaries[.]" He gave the following testimony:

A. Oh, bolt cutters are used to cut chains, padlock, anything like that.

. . . .

Q. What would you use an ax for? Based on all the investigations you've done regarding burglaries, how would the ax be used?

A. Could use 'em to cut a way into a window or whatever.

Q. What about screw drivers [sic] which you recovered ... ?

A. Screw drivers [sic] are used a lot of times to punch door locks and stuff.

Q. What about the channel locks, could that be of any use regarding the burglary?

A. Not for entry anything, no.

Q. So, out of all these items, primarily, the bolt cutters, the ax and the screw drivers [sic] then could be utilized—

A. Right.

Q. —for burglaries?

A. Right.

On cross-examination, Officer Leach admitted that the "primary use[s]" of the items recovered from the backpack were legal. Officer Leach also stated that while Brown was fingerprinted when arrested, neither the backpack nor any of the tools were dusted for latent fingerprints, although they "probably should have" been. Furthermore, Officer Leach agreed that there were no initials on the backpack and no other identification that would indicate who owned the backpack.

## B. The Defense's Evidence

### 1. Charles Inferrera (Inferrera)

The first defense witness was Inferrera, who stated that he was at the mini mart in the white van with Brown on November 14, 1999. According to Inferrera, the van was parked in Lane 3 and the police car was in Lane 4. When asked what time they were at the mini mart, Inferrera testified:

> I don't—I don't remember. Kind of early in the morning. Maybe after midnight. I don't remember too good about time wise. It was kind of late. Early morning hours.

Inferrera related that he was sitting in the passenger's seat of the white van, a man named Malcolm [7] was driving, and Brown "was sitting on the floor in between the two chairs in the middle on the floor leaning against the lumber that was in the back[.]" Although Brown's whole body could not be seen through the window of the van, Brown's head was visible.

Inferrera insisted that at the mini mart, he was the only one who exited the van. He got out from the passenger's door, went inside the store to purchase "sodas[,]" and reentered the van through the same passenger's door. After he returned to the van, the three of them left the mini mart, with Malcolm driving. Brown never drove the van. According to Inferrera, when the van reached Wahiawā, the "[p]olice w'en try pull us over" and "[Malcolm] started speeding." During this time, Brown was still on the floor between the seats. The van then sped through an intersection and crashed into a wall. After the crash, Brown was in the back of the passenger's seat, apparently in pain, "saying something about his back. His back broke or something." Inferrera speculated that Brown's injuries occurred when the plywood hit Brown and threw him forward. Inferrera did not know where Malcolm went after the accident. Inferrera, however, jumped out of the van and ran away.

### 2. Gregory John Tavares (Tavares)

Tavares, the chief investigator for the Office of the Public Defender, testified that he was assigned to find the elderly Japanese male witness, who reportedly communicated with Lt. Gaytan and Officer Merrill at the scene of the crash. Tavares went to the corner of Avocado Street and Walker Avenue on "consecutive Sundays three times at about five, five thirty in the morning," "[p]arked [his] car off to the side[,]" and "stood around there and just watched." At no time did he notice a "five feet, 180 pounds, heavy build [sic] Japanese male about 60, 70 years old[,]" who fit the description of the alleged witness.

Tavares testified that he was also instructed to find the clerk who worked at the mini mart on November 14, 1999 between 5:00 and 5:30 a.m. After locating the clerk, Tavares showed him "mugshots" of Brown and Inferrera but the clerk was unable to "recall seeing any of those guys in his store." Tavares also related that he went to the mini mart to learn what the store's policy was concerning the use of video cameras. He learned that the mini mart keeps videotapes

7. Charles Inferrera (Inferrera) testified that he met Malcolm from "partying" but did not know Malcolm's last name. Inferrera described Malcolm as follows:

> Q. If you remember, about how tall is Malcolm?
>
> A. I don't know. Five, five feet something.
> Q. I mean, is he, if you remember, is he like a slim guy or a medium guy?
> A. Medium. Kind of medium, yeah.

for thirty days and then recycles them unless the police request the videotapes be preserved. No police request was made in this case.

### 3. Bryan E. Brown

Brown testified that Inferrera and Inferrera's friend, Malcolm, picked him up at the Wal–Mart in Kunia at approximately 9:30 p.m., on November 13, 1999.[8] Brown did not know Malcolm's last name. When Brown was picked up at Wal–Mart, Malcolm was driving the van. The three of them then proceeded to Waipahu to sell lumber that had already been loaded in the van to "a person [Brown] had worked with before[.]" Brown testified that after the sale of the lumber, "Malcolm and [Inferrera], . . . they had some money in their pocket and they wanted to spend some money." They then drove to Nānākuli, arriving at approximately 11:00 p.m. and went "by a house for buy drugs." Immediately following this stop, they went to Brown's house, which is also located in Nānākuli, so that Brown could give his wife a hundred dollars that he earned as a commission from the lumber sale.

Thereafter, Brown testified, they drove the van to Waipiʻo. "Right by Mililani Cemetery[,] we stopped at the store and . . . bought beer and we when [sic] go drink beer close to the cemetery in the bushes over there." They stayed there, "talk[ing,]" from about midnight until approximately 4:00 a.m., then traveled "about a quarter mile down the road" to a "fenced[-]in area [where Inferrera and Malcolm] had an [sic] stack of lumber that they'd previously put there." According to Brown, Inferrera and Malcolm then "loaded thirty something pieces of three[-]quarter[-]inch plywood in the van." Brown testified that before the lumber was placed in the van, he was sitting "[i]n the back of the van[,] . . . behind the driver's seat." Brown was asked to describe where he sat once the lumber was loaded, and the following colloquy transpired:

A. I was sitting in between the seats but a little bit behind the seats. So the

back it had—the back of the van the lumber was all the way to the back to where it left me about two feet, two feet of space from, you know, the base of the chair to the lumber so I—and then my feet was where the chairs were. So, I was like probably two feet behind the seat and my feet were in the front, you know, the console that you guys explained.

Q. Your feet were on the console?

A. No. If I stretched them out all the way, they would touch the console.

Brown related that after the lumber was loaded in the van, the three of them headed to the mini mart, with Malcolm driving. At the mini mart, Malcolm parked the van in Lane 3, and Inferrera went into the store to purchase "soda." Inferrera then returned to the van about five minutes later, entering through the passenger's door. They then left the mini mart, supposedly to go back to the Kunia Wal–Mart. However, Brown testified, Malcolm got "nervous" and "panicked" after observing a police car following them. When the police car's blue light started flashing and the siren started wailing, "Malcolm gave it gas[,]" made a number of quick left turns, and "the back end of the van started to go back and forth[.]" Brown testified that he "started screaming" and tried to get Malcolm to stop. Brown then attempted to "reach for the latch for the side of the door" so he could get out "as soon as the van stopped," but "[t]here was no . . . mechanism to open the door." As he was reaching for the door, "the van came back across [Kamehameha] Highway" "at about 55 to 70 miles an hour" and hit a dip in the road, causing the plywood to slide forward and land on his thigh and resulting in "[t]he whole side of [his] leg . . . in the back" becoming "numb." Then, Brown stated,

[t]he van started screeching. It was like it was sliding sound. And I heard them—I heard the guys in the front yell watch out, watch out and then boom. That's all it was was one boom and I seen stars. The lumber that was in the back make like a domino effect from the impact and w'en

---

8. On cross-examination, Defendant–Appellant Bryan E. Brown, also known as Bryan E. Johnson, testified that he did not meet Inferrera and Malcolm at 9:30 p.m., but that he received a phone call from them at approximately that time, and they met fifteen or twenty minutes later.

come slide. And, as—if you're tall as me and you're leaning over the, you know, in the position I was in on the seat and the lumber came it w'en hit my side again and that gave it another wack [sic]. It was like it pinned me between the passenger seat and the lumber.

I w'en break—I w'en break the impact of the lumber hitting the passenger seat because my position I was in. And, as—as far as the driver's seat the driver's seat was all the way pushed forward.

Malcolm and Inferrera then ran away. Brown "wanted to run away," but because he was injured (his leg was dislocated from his hip, his leg would not move from the knee, and he felt like his muscles were tearing), he had a hard time maneuvering in the van. Due to his injury, Brown was unable to go forward through the passenger's door, so he instead went backwards through the driver's door. Brown used the steering wheel and roof of the van "for leverage to pull [his] body" over the seat and then "fell to the ground." He then crawled across on his right side, which was numb, and tried to use the wall and the front of the van to pull himself up.

Additionally, Brown testified that he was about six feet tall, weighed 236 pounds, never drove the van that evening, did not own the backpack of tools found in the van, and had no idea who owned the backpack of tools.

## DISCUSSION

### A. Standard of Review

■ The Hawai'i Supreme Court has "adhered for over 140 years to the fundamental principle, which lies at the foundation of jury trial in every country blessed with that institution, that the jury is to pass upon the facts and the court upon the law." *State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997) (internal quotation marks omitted). Thus, "the jury is the sole judge of witness credibility and the weight of the evidence." *Id.* (brackets and internal quotation marks omitted).

■ The supreme court has also repeatedly emphasized that, in reviewing the legal sufficiency of evidence to support a conviction on appeal,

> evidence adduced in the trial court must be considered in the strongest light for the prosecution ...; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*Id.* (quoting *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Eastman*, 81 Hawai'i at 135, 913 P.2d at 61 (brackets omitted).

### B. Evidence as to the Driver of the White Van

■ Brown challenges his conviction for the "Unauthorized Control of Propelled Vehicle" and the other driving offenses (Counts 1, 2, and 4) on grounds that "there was no direct evidence that Brown had actually operated the van in question, a material element" of these driving offenses. Brown argues that the only evidence that tends to establish that he was driving was the testimony of Lt. Gaytan, which was insufficient because "[Lt. Gaytan] never clearly stated that he saw Brown driving the van." Lt. Gaytan's testimony was only that he saw Brown enter the vehicle through the driver's door.

■ This court has recognized, however, that a person may be proven to be a driver based on "reasonable inferences drawn from circumstantial evidence." *State v. Chow*, 77 Hawai'i 241, 245, 883 P.2d 663, 667 (App. 1994) (citation omitted). In *Chow*, a police officer pulled a vehicle over after seeing it make an illegal turn. The officer testified that after he stopped the vehicle, he saw no movement within the vehicle. Additionally, when he approached the vehicle, the defendant was seated in the driver's seat and an individual named "Larsen" was seated in the front passenger's seat. Although both the

defendant and Larsen testified that Larsen had been driving and that the defendant had been sitting in the back seat and only moved to the driver's seat after the car was stopped by the officer, this court held, based on the police officer's testimony, that there was substantial evidence for a jury to find that the defendant was the driver. *Id.* at 246, 883 P.2d at 668.

In this case, viewing the evidence in the light most favorable to the State, we similarly conclude that there was substantial evidence that Brown was the driver of the white van. Lt. Gaytan testified that he saw Brown exit the mini mart and enter the van through the driver's door. Lt. Gaytan stated that Brown was "directly in front" of him, about twelve feet away, and "looking at [him]" as Brown approached the van. Lt. Gaytan also described the lighting at the mini mart as "very bright[,]" even more brightly lit than the courtroom. Although Inferrera testified that there were three occupants of the van and that Brown was seated in the cargo area of the van, Inferrera also related that Brown's head was clearly visible from outside the van. However, Lt. Gaytan testified to seeing only two occupants in the van.

Finally, the evidence indicates that when the van finally came to a halt after it crashed into the wall, the plyboard in the back of the van shifted and moved the driver's seat forward, thus explaining Brown's serious injuries. Additionally, only the driver's and front passenger's doors were open, and because Brown was found on the ground in front of the van on the driver's side, the jury could reasonably infer that Brown was, in fact, the driver and there was no driver named Malcolm.

In summary, there was clearly substantial credible circumstantial evidence in the record for a jury to find that Brown did, in fact, operate the white van on the morning in question.

### C. *Evidence of Unlawful Possession of Burglar's Tools*

Nearly all jurisdictions have enacted statutes making it unlawful to possess burglar's tools. Annot., *Validity, Construction, and Application of Statutes Relating to Bur-*

*glars' Tools,* 33 A.L.R.3d 798, § 2[a] at 804–05 (1970 & Supp.2001). "[T]he purpose of all such statutes is to deter or prevent the commission of burglary and related offenses by enabling enforcement authorities to act before the prospective burglar has had the opportunity to gather his [or her] tools, weapons, and plans and strike in secret." *Id.* at 805.

In Hawai'i, the statute making the possession of burglar's tools unlawful is HRS § 708–812(1)(a), which provides, in relevant part, as follows:

> **Possession of burglar's tools.** (1) A person commits the offense of possession of burglar's tools if:
>
> (a) The person knowingly possesses any explosive, tool, instrument, or other article adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking, and the person intends to use the explosive, tool, instrument, or article, or knows some person intends ultimately to use it, in the commission of the offense of the nature described aforesaid[.]

The official Commentary on HRS § 708–812 states, partly, as follows:

> This section provides a vehicle for punishing those who possess or traffic in devices adapted, designed or commonly used in the commission of offenses involving forcible entry or theft by physical taking. The person who possesses the designated type of device with intent to use the same in the proscribed manner is covered—and .so is the manufacturer, distributor, and transporter who deals in such devices if he possesses the same with knowledge "that some person intends ultimately to use it" in the commission of one or more of the offenses for which it is adapted, designed, or commonly used.
>
> Previous Hawaii law did not have an independent offense dealing with possession of burglar's tools; this section, therefore, represents an addition to our law.

Construing the clear language of HRS § 708–812(1)(a) in light of the Commen-

tary, we conclude that a conviction for Unlawful Possession of Burglar's Tools cannot be sustained unless the State establishes, beyond a reasonable doubt, that the defendant:

(1) knowingly possessed an explosive, tool, instrument, or other article;

(2) had knowledge that the explosive, tool, instrument, or other article was adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking; and

(3) had the intent to use the explosive, tool, instrument, or other article, or had knowledge that some person intended to use the explosive, tool, instrument, or other article to commit or facilitate the commission of an offense involving forcible entry into premises or theft by a physical taking.

■ The Hawaiʻi Supreme Court has recognized that

[t]he law, in general, recognizes two kinds of possession: actual possession and constructive possession. A person who *knowingly* has direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, *knowingly* has both the power and the intention at a given time to exercise dominion over a thing,

either directly or through another person or persons, is then in constructive possession of it.

*State v. Jenkins*, 93 Hawaiʻi 87, 110, 997 P.2d 13, 36 (2000) (quoting *State v. Mundell*, 8 Haw.App. 610, 617, 822 P.2d 23, 27 (1991)), *reconsideration denied*, 8 Haw.App. 661, 868 P.2d 466 (1991) (emphases added in *Jenkins*). Additionally, "possession" involves two prongs: (1) the possession of an object itself, and (2) "the particular qualities of the object that make it illegal to possess it[.]" *Jenkins*, 93 Hawaiʻi at 111, 997 P.2d at 37.

■ In *Jenkins*, the supreme court explained that, pursuant to HRS § 702–202 (1993),[9] the first prong of possession is satisfied when an individual acts *knowingly* with respect to his or her conduct. *Id.* That is, "the prosecution must first adduce evidence that the defendant knowingly procured or received an object, or was aware of his or her control of that object for a sufficient period to have terminated possession." *Id.*

With respect to the second prong of possession, the *Jenkins* majority held that, pursuant to HRS § 702–204 (1993),[10] if a possession offense does not specify the state of mind required to establish the elements of the offense, the second prong is satisfied by proof of at least a reckless state of mind. *Id.* The possession offense involved in *Jenkins*

---

9. HRS § 702–202 (1993) states as follows:

**Voluntary act includes possession.** Possession is a voluntary act if the defendant knowingly procured or received the thing possessed or if the defendant was aware of the defendant's control of it for a sufficient period to have been able to terminate the defendant's possession.

The Commentary on the foregoing statute states:

Offenses of possession are pervasive in the law, but possession per se is not a bodily movement or an omission, although the course of conduct leading to or continuing possession might include a voluntary act or omission. Therefore, this section makes it explicit that possession is an act, within the meaning of §§ 702–200 and 201, if the possessor knowingly procured or received the thing possessed or was aware of control thereof for a sufficient period to have been able to terminate possession. The "thing possessed" refers to the physical object per se, knowledge of particular qualities or properties of the physical object possessed is dealt with as a mens rea problem in subsequent sections.

Hawaii law has had many statutes making various kinds of possession illegal. When considered with the previous statutory requirement that penal liability must be based on "doing what the penal law forbids" the logical implication of such statutes was that possession is an act within the penal law. This section merely states that position with greater clarity.

(Footnotes omitted.)

10. HRS § 702–204 (1993) provides as follows:

**State of mind required.** Except as provided in section 702–212, a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.

was HRS § 134–7(b) (1993 & Supp.1997), which provided that no person who has been convicted of a felony shall "own, possess, or control any firearm or ammunition therefor." *Id.* at 109, 997 P.2d at 35. Because HRS § 134–7(b) was silent regarding the required state of mind for conviction, the supreme court held, in light of HRS § 702–204, that to establish the second prong of possession for HRS § 134–7(b) offense purposes, "the prosecution must, at the very least, adduce evidence that the defendant possessed the object in reckless disregard of the substantial and unjustifiable risk that it was a firearm." *Id.* at 111, 997 P.2d at 37 (citing HRS § 702–204).

█ In this case, the possession offense at issue, HRS § 708–812(1)(a) specifically requires a "knowing" state of mind as to possession of burglar's tools. Therefore, the State was required to establish that Brown not only knowingly possessed the tools in the backpack but also *knew* that the tools were "adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking[.]" HRS § 708–812(1)(a).

In light of the foregoing discussion, we examine whether substantial evidence of each of the elements of the unlawful possession of burglar's tools offense was adduced at trial.

### 1. Knowing Possession of an Explosive, Tool, Instrument, or Other Article

This court has previously stated that

[t]o support a finding of constructive possession the evidence must show "a sufficient nexus between the accused and the [item] to permit an inference that the accused had both the power and the intent to exercise dominion and control over the [item]." Mere proximity is not enough.

*State v. Mundell,* 8 Haw.App. at 622, 822 P.2d at 29, *overruled on other grounds by*

*State v. Jenkins,* 93 Hawai'i at 112, 997 P.2d at 38.

In *State v. Moniz,* 92 Hawai'i 472, 476, 992 P.2d 741, 745 (App.1999), this court listed several factors that other courts have considered to infer a nexus between a defendant and drugs to support a finding of drug possession [11]:

1) the defendant's ownership of or right to possession of the place where the controlled substance was found; 2) the defendant's sole access to the place where the controlled substance was found; 3) defendant under the influence of narcotics when arrested; 4) defendant's presence when the search warrant executed; 5) the defendant's sole occupancy of the place where the controlled substance was found at the time the contraband is discovered; 6) the location of the contraband; 7) contraband in plain view; 8) defendant's proximity to and the accessibility of the narcotic; 9) defendant's possession of other contraband when arrested; 10) defendant's incriminating statements when arrested; 11) defendant's attempted flight; 12) defendant's furtive gestures; 13) presence of odor of the contraband; 14) presence of other contraband or drug paraphernalia, not included in the charge; 15) place drugs found was enclosed.

*Id.* (quoting *Wallace v. State,* 932 S.W.2d 519, 524 n. 1 (Tex.App.1995) (ellipses and brackets omitted).

This court recognized, however, that while the foregoing factors were helpful in the abstract in evaluating whether constructive possession exists in particular factual circumstances, they are far more difficult to apply in cases "where a defendant does not have exclusive possession or control of the place where drugs are found and no drugs are found on the defendant's actual person." *Id.* In such cases, we said

it is necessary for the State to show facts that would permit "a reasonable mind to conclude that the defendant had the intent

---

11. We are aware that several of the factors listed in *State v. Moniz,* 92 Hawai'i 472, 476, 992 P.2d 741, 745 (App.1999), to infer a nexus between a defendant and drugs to support a finding of possession are not relevant in the context of a possession of burglar's tools offense. Neverthe-

less, the remaining factors are helpful in analyzing whether, under the totality of circumstances, a defendant was in constructive possession of tools that were found in close proximity to the defendant.

and capability to exercise control and dominion over the drugs." That is, the evidence "must raise a reasonable inference that the defendant was engaged in a criminal enterprise and not simply a bystander." Proof of the defendant's knowledge of the presence of drugs and the defendant's ownership or right to possession of the place where the drugs were found, alone, are insufficient to support a finding of the exercise of dominion and control. Other incriminating circumstances must be present to buttress the inference of knowing possession and provide the necessary link between a defendant and illegal drugs.

*Id.* at 476–77, 992 P.2d at 745–46 (brackets and citations omitted).

 Relying on *Mundell* and *Moniz*, Brown argues that the State has offered no evidence to establish the nexus between himself and the tools, other than the fact that he was the driver of the stolen van and the tools were found in close proximity to him. Brown points out that there was no evidence that he was aware of what items were on the passenger's side of the van; there were no identifying marks on the backpack, such as initials or a name; there was no identification found within the backpack; none of the tools were labeled or had any identifying marks; and no fingerprints were taken from the backpack or the tools "to establish whether Brown had in fact had possession of them." In addition, Brown argues, the backpack that contained the tools was found on the floorboard near the passenger's seat, where another passenger was purportedly sitting. According to Brown, "a reasonable inference would be that the passenger had the power and intent to exercise dominion and control over the backpack, not Brown, the alleged driver."

We disagree with Brown.

 We note, first of all, that HRS § 708–812(1)(a) does not require *ownership* of burglar's tools, but proof of *possession.* See Annot., § 7[a] at 33 A.L.R.3d at 820–21 (stating that the "decided cases are uniform in holding that ownership is not a necessary precondition to a finding of possession"). The fact that the State did not establish ownership of the backpack or the tools is, therefore, immaterial, as long as there was substantial evidence to establish, beyond a reasonable doubt, that Brown had "the power and the intent to exercise dominion and control over the [tools]." *Mundell,* 8 Haw.App. at 622, 822 P.2d at 29.

In the present case, there was ample evidence from which the jury could infer that Brown had the power and intent to exercise dominion and control over the tools. The backpack was on the floorboard near the front passenger's seat, open and within Brown's reach, with a pair of bolt cutters visibly sticking out of the backpack. *See State v. Lake,* 686 S.W.2d 19, 21 (Mo.Ct.App. 1984) (holding that "the jury could conclude that [defendant] had possession of the tools. The tools were on the floor of the van and were highly visible. They were not concealed in any fashion."). Since the white van had just recently been stolen from NF, which testimony indicated was a seafood distributor, the jury could reasonably infer that the backpack containing the tools had not been placed in the van by any employee of NF, but by Brown or the other passenger in the stolen van.

There was also evidence that Brown acted furtively when he saw Lt. Gaytan at the mini mart and attempted to evade the police at high speed. Moreover, after the van crashed into the wall, Brown tried to run away from the scene but was unable to because of his physical injuries. *See United States v. Chambers,* 918 F.2d 1455, 1458 (9th Cir.1990) (holding that "[t]he nature of an attempt to flee from law enforcement officials is probative of possession as well as knowledge").

 The fact that the backpack was located on the floorboard near the passenger's seat, where another person was sitting, does not defeat Brown's possession. Hawai'i recognizes that two or more persons can be in joint possession of an item. *Mundell,* 8 Haw.App. at 617, 822 P.2d at 27. Where two co-conspirators are engaged in a joint criminal activity, possession by one of the tools to further the criminal activity will be imputed to the other. *Solomon v. State,* 180 Ga.App. 636, 350 S.E.2d 35, 36 (1986). *See also Franklin v. Commonwealth,* 477 S.W.2d 788, 791 (Ky.1972) (stating that where there was

sufficient evidence from which the jury could infer a concerted effort, a joint enterprise, of two individuals to commit a burglary, "possession of burglary tools by one coconspirator constitutes possession by the other"). In the present case, there was substantial evidence that both Brown and the passenger were engaged in a joint criminal activity, i.e., unauthorized control of a stolen vehicle. Therefore, possession of tools to further the criminal activity could be imputed to either of them.

### 2. Knowledge of the Unlawful–Use Qualities of the Explosive, Tool, Instrument, or Other Article

■ It is an essential element of the unlawful possession of burglar's tools offense that a defendant's knowledge of the unlawful-use qualities or properties of the articles found in the defendant's possession be established beyond a reasonable doubt. *Cf. State v. Jenkins,* 93 Hawai'i at 111, 997 P.2d at 37. More specifically, the State must adduce evidence that the defendant possessed an explosive, tool, instrument, or other article, *knowing* that the "explosive, tool, instrument, or other article [was] adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking[.]" HRS § 708–812(1)(a).

■ The "mere possession of tools, instruments, or devices not adapted, designed or commonly used in breaking into buildings, etc., is not sufficient to subject the possessor to prosecution" under the statute, *State v. Salernitano,* 27 N.J.Super. 537, 99 A.2d 820, 823 (App.Div.1953), for if this were the case, "every carpenter or mechanic who carries with him [or her] the implements of his [or her] trade, or every motorist who goes about with an ordinary tool kit in his [or her] automobile" would be branded a criminal under the statute. *Id.* Therefore, the state must bear the burden of proving, beyond a reasonable doubt, that such implements were possessed with the knowledge that they are tools that can be used to commit burglary or theft.

■ In this case, the tools found in the backpack on the floorboard of the white van could be commonly used for ordinary and honest purposes. However, they could also be "quite . . . efficacious in the hands of a burglar to carry out his [or her] felonious intent[.]" *Id.* We examine, therefore, whether there is substantial evidence in the record to establish that Brown had the requisite knowledge that the tools in the backpack could be used to commit an offense involving forcible entry into premises or theft by physical taking.

We conclude that there was substantial circumstantial evidence that Brown knew of the unlawful-use qualities of the tools in the backpack. The evidence revealed that Brown was driving a stolen van, the sides of which had been spray-painted over and the license plate of which had been replaced. Although the keys to the van had apparently either been left in the van or taken from the NF desk drawer so that Brown did not have to actually use any of the tools to break into the van, the jury could have reasonably inferred that Brown had the tools in his possession because he had planned to use them to break into the van or commit other burglary or theft offenses.

### 3. Intent to Use or Knowledge That Some Person Intends to Use the Tools to Commit or Facilitate the Commission of an Offense Involving Forcible Entry or Theft

The Hawai'i statute requires proof that Brown intended to use, or knew that "some person intend[ed] ultimately to use[,]" the tools for "committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking[.]" HRS § 708–812(1)(a).

Courts have recognized that because tools can generally be used "as easily for an innocent purpose as for an illegal purpose, the question of intent must be the controlling factor in establishing the defendant's guilt or innocence" of an unlawful use of burglar's tools offense. *People v. Spencer,* 10 Ill. App.3d 229, 294 N.E.2d 17, 19 (1973). *See also McGlon v. State,* 504 So.2d 745, 746 (Ala.Crim.App.1987) (holding that "[t]he *intention* to use the 'explosive, tool, instrument

or other article' in the commission of a 'forcible entry' or 'theft by a physical taking' is the most important element of the offense") (emphasis in original); *Moss v. Commonwealth,* 29 Va.App. 1, 509 S.E.2d 510, 511 (1999) (stating that "mere possession ... is not prohibited[,] ... [t]he gravamen of the offense arises from the possessor's 'intent to use' these 'common, ordinary' objects for a criminal purpose specified by statute") (citation omitted).

The vast majority of jurisdictions that have considered the intent element of unlawful possession of burglar's tools statutes have generally taken "the position that while it is unnecessary to prove that the accused possessed the tools in question with the intent to commit a particular burglary, a general burglarious or felonious intent is an essential element of the offense." Annot., 33 A.L.R.3d § 9[a] at 839. In *State v. Brocato,* 222 Kan. 201, 563 P.2d 470 (1977), for example, the Kansas Supreme Court stated:

> It is appropriate to observe, however, that an intent to use the tools in a particular or specific burglary is not required. The intent is sufficient if it consists of a general purpose to employ the instruments in the course of burglarious episodes, whenever and wherever opportunity might present itself.

*Id.* at 473 (quoting *State v. Hurt,* 200 Kan. 153, 434 P.2d 999, 1004 (1968)) (internal quotation marks omitted). Similarly, the Iowa Court of Appeals noted that "a particular time or place for using the tools need not be shown.... [I]t is sufficient to show that defendant had a general intent to use tools or implements for a burglarious purpose and the intention as to any particular time or place of using the same is not material." *State v. Salkil,* 441 N.W.2d 386, 388 (Iowa Ct.App.1989) (citations omitted). The Ohio Court of Common Pleas explained the state's burden of proof as to the intent element this way:

> The state does not have to show any specific intent on the part of the accused to use the tools in the way indicated; but the gist of the offense is the possession of such implements with the knowledge that they are burglars [sic] tools, coupled with the

general intent to either use or furnish or supply them to be used for burglarious purposes. That is, the state is not obliged to show that he [or she], the accused, intended to use them on any particular building, at any particular time, on any particular occasion. But if he [or she] had possession of these tools, did he [or she] know they were burglars' tools? And did he [or she] have the general intent to use them for that purpose, or to furnish or supply them to somebody else then in his [or her] mind, to be used for that purpose. Use of the tools or implements in question does not need by any means to be made by the defendant, but they may be used by some other person or persons with his [or her] knowledge or consent, and on his [or her] furnishing these implements for that purpose.

*State v. Hahn,* 1900 WL 1281, at *2 (Ohio Com.Pl.1900), *also available at* 8 Ohio N.P. 101.

Generally, "[i]n the absence of a confession, the requisite intent must ... be proved by circumstantial evidence." *People v. Faginkrantz,* 21 Ill.2d 75, 171 N.E.2d 5, 8 (1960). *See also Salkil,* 441 N.W.2d at 387–88 (holding that "[t]he element of intent is rarely capable of direct proof and may be shown by circumstantial evidence" "so long as the evidence raises a fair inference of guilt and does more than create speculation, suspicion, or conjecture").

Since "criminal intent is rarely susceptible to direct proof, the fact-finder may determine intent by such reasonable inference and deduction as may be drawn from facts proved by evidence in accordance with common experience and observation." *Id.* at 388 (internal quotation marks and citation omitted). In this regard, courts have considered factors such as the following in determining whether substantial circumstantial evidence of intent to use tools to commit a burglary or theft exists: (1) concealment of tools on a defendant's person, in his or her clothing, or inside the passenger area of the car, instead of in the trunk or in a shop, *Brocato,* 563 P.2d at 473; (2) the defendant's flight or attempt to flee from the police, or the defendant's resistance to arrest, *id.;* (3)

**340**

the defendant's apprehension in a suspicious area at a suspicious time and under suspicious circumstances, *People v. Watson,* 24 Ill.App.3d 237, 321 N.E.2d 187, 190 (1974); (4) the absence of a non-criminal explanation for the tools, *Spencer,* 294 N.E.2d at 20; (5) the number and combination of the tools found in the defendant's possession, *State v. MacDonald,* 129 N.H. 13, 523 A.2d 35, 38 (1986); (6) the furtive movements engaged in by the defendant when the police approached the defendant's car, *State v. Quast,* 381 N.W.2d 20, 21 (Minn.Ct.App.1986); (7) conduct by the defendant that appears intended to aid a passenger to dispose of contraband, *Chambers,* 918 F.2d at 1458; and (8) proof of an actual break-in or burglary, *State v. Lewis,* 599 S.W.2d 94, 99 (Mo.Ct.App.1980).

In this case, considering all the circumstantial evidence, the jury determined that the intent element of the unlawful possession of burglar's tools was established beyond a reasonable doubt. Based on our review of the record, we cannot conclude that the jury clearly erred in its determination.

The record reveals substantial evidence that Brown was driving a stolen van, the identity of which had been masked by spray paint and the substitution of a stolen license plate. Brown testified that Malcolm and Inferrera loaded about thirty sheets of plywood from a "fenced[-]in area" that had "bushes probably about six feet high" around it with a gate hanging on it, about "a quarter mile down the road" from where they were drinking beer. Although Brown denied that the plywood was taken from "a construction site" or that it was "stolen lumber," the jury could have found that the lumber had been stolen from a construction site and that the bolt cutters had been used to cut the gate or lock to access the site. Moreover, the evidence that Brown was far away from home at a time when the mini mart was likely to not have any customers, left the mini mart as soon as he saw Lt. Gaytan's police vehicle, led the police on a high-speed chase, attempted to flee after the van crashed into the wall, and did not have a non-criminal explanation for the tools also allow the inference that Brown possessed the tools in the backpack with the requisite intent.

CONCLUSION

Based on the foregoing discussion, we affirm the June 20, 2000 Judgment convicting and sentencing Brown for the offenses of (1) Unauthorized Control of Propelled Vehicle, (2) Driving without License, (3) Possession of Burglar's Tools, and (4) Turning at Intersections.