992 P.2d 741

**STATE of Hawaiʻi, Plaintiff–Appellee,**

**v.**

**Juliet MONIZ, Defendant–Appellant,**

**and**

**Richard Moniz, Defendant.**

**No. 21719.**

Intermediate Court of Appeals of Hawaiʻi.

Dec. 27, 1999.

Certiorari Denied Feb. 4, 2000.

Randal I. Shintani, on the briefs, Honolulu, for defendant-appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

Defendant–Appellant Juliet[1] Moniz (Juliet) appeals from the June 23, 1998 Judgment of the Circuit Court of the First Circuit, convicting and sentencing her for Promoting a Detrimental Drug in the Third Degree, specifically marijuana, in violation of Hawai'i Revised Statutes (HRS) § 712–1249 (1993),[2] and Unlawful Use of Drug Paraphernalia, specifically, a measuring scale, in violation of HRS § 329–43.5(a) (1993).[3]

Juliet raises three issues on appeal. First, there was insufficient evidence to support her conviction for Promoting a Detrimental Drug in the Third Degree (for the marijuana). Second, there was insufficient evidence to support her conviction for Unlawful Use of Drug Paraphernalia (for the scale). And third, it was inconsistent for the jury to find her guilty of Unlawful Use of Drug Paraphernalia but not guilty of Promoting a Dangerous Drug in the Third Degree, specifically .004 grams of methamphetamine located in the bowl of the scale, a violation of HRS § 712–1243 (1993 & Supp.1998).[4]

1. It is not clear whether the first name of Defendant–Appellant Juliet Moniz (Juliet) is "Juliet" or "Juliette." Both spellings are used in documents included in the record on appeal and the appellate court records.

2. Hawai'i Revised Statutes (HRS) § 712–1249 (1993) states as follows:

**Promoting a detrimental drug in the third degree.** (1) A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana or any Schedule V substance in any amount.

(2) Promoting a detrimental drug in the third degree is a petty misdemeanor.

3. HRS § 329–43.5(a) (1993) states as follows:

**Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

4. HRS § 712–1243 (1993) states as follows:

**Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

(2) Promoting a dangerous drug in the third degree is a class C felony.

This statute was amended in 1996 (Juliet was alleged to have violated the statute in 1995) to add the following subsection:

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a

474

We agree with Juliet's first and second contentions. Accordingly, we reverse her convictions for Promoting a Detrimental Drug in the Third Degree and Unlawful Use of Drug Paraphernalia and find it unnecessary to address the inconsistent verdict issue.

## BACKGROUND

On December 16, 1995, pursuant to a search warrant, police officers of the Honolulu Police Department entered and searched Apartment D at 94–154 'Awalau Street, where Juliet and her husband, Richard Moniz (Richard), resided with their two children. At the time the police officers executed the search warrant, Juliet was present in the apartment with her two children and her aunt's two granddaughters. Juliet testified that she was in the kitchen cooking, when the police knocked on the door. After letting the police into the apartment, she sat down on the couch in the living room. Three of the four children were also in the living room, and the fourth child was taking a bath. Richard was not home at the time, but he arrived shortly thereafter. Juliet testified that she stayed on the couch throughout the search.

The officers recovered various items from the apartment, including: a clear plastic bag, approximately two and a half inches by two inches in size, containing a green leaf-like substance, subsequently determined to contain .634 grams of marijuana; a plastic gram scale, purple in color and approximately four and a half inches by two inches in size, the bowl of which contained traces of a white crystal-like substance, subsequently tested to be .004 grams of methamphetamine; and cash totaling $1,900.00. As a result of the search, Juliet and Richard were indicted on September 12, 1996 and charged in count I with Promoting a Dangerous Drug in the Third Degree (for the methamphetamine residue), in count II with Unlawful Use of Drug Paraphernalia (for the scale), and in count III with Promoting a Detrimental Drug in the Third Degree (for the marijuana).

The testimony and physical evidence offered at trial revealed that the marijuana was recovered from a closed plastic fishing tool box located in the top drawer of a dresser in the bedroom; the scale, along with Richard's old driver's license, was found in an orange McDonald's "Happy Meal" jack-o-lantern bucket, its cover "cut open[,]" that was sitting on top of a video cassette recorder located on the dresser; and the cash, in hundred, twenty, and one dollar bills, was found in a black woman's handbag, a small brown patterned handbag, and a turquoise plastic child's handbag with pink trimming, located around the apartment. Richard testified that the black woman's handbag in which Juliet's visa and a wad of hundred dollar bills were found belonged to Juliet. Richard also testified that the other two handbags, each of which housed a wad of one dollar bills folded in half with a rubber band around, belonged to his children. According to Richard, he "used to get plenty dollar bills, so [he] used to give [the children] a whole bunch at one time." No illegal drugs were found in any of the handbags.

The essence of Juliet's defense was that Richard, and not she, was responsible for the scale, marijuana, and methamphetamine residue found in their apartment.

In support of Juliet's defense, Richard testified that he had pleaded no contest to the charges against him, which were identical to the charges against Juliet. Richard admitted that he used and sold drugs. He stated that he had bought the scale "to make sure [he didn't] get ripped off and to make sure [he didn't] rip off nobody[,] too," that Juliet was not present when he bought the scale, and that he didn't tell her that he was going to buy it " 'cause it's my business. She's got nothing to do with it." When asked if Juliet ever held or had possession of the scale, Richard responded, "No. Maybe I might

dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

have left it out. Maybe. I'm not too sure. Or, you know, she might have put it away."

Richard also testified that Juliet did not use drugs, strongly disapproved of his using drugs, and would leave the room if she saw him smoking marijuana or crystal methamphetamine. He stated that he and Juliet would often "get into big fights" because he would often spend his paychecks on drugs and not come home for three or four days after he got a paycheck. Richard accepted sole responsibility for the marijuana found by the police, which Richard testified was for his personal use. He also stated that the fishing tool box was in his dresser drawer, where he stored his "shorts and stuff." However, he admitted that Juliet cleaned the apartment and would know what was in the apartment. Richard also conceded that Juliet washed, folded, and put the clothes away in the drawers and "would see if something was in the drawer[.]" Moreover, he sometimes gave drug money to Juliet and she knew the source of the money.

Regarding the large sum of money found in the apartment, Richard explained that Juliet was going to use the money for Christmas gifts and for a birthday party for their daughter. He also stated that the money had come from the monthly deferred compensation payments he received after terminating his employment with the State of Hawai'i, Harbors Division.

Juliet testified that she was aware that Richard used drugs and she had seen the marijuana in "[Richard's] drawer." However, she denied using drugs herself and stated that she had never touched the scale and didn't know what the scale was used for. She also testified that although she saw the plastic fishing tool box in the drawer, she "didn't even notice. Just put [Richard's] clothes on top. That's all. I never touch nothing." Juliet acknowledged that the purses or handbags in which the money had been found belonged either to her or her children. She also confirmed Richard's testimony that the money in her handbag was for their daughter's birthday party and for Christmas gift purchases. She explained that she could not deposit the money in a bank account because she received financial assistance and food stamps from the government on behalf of her children and was required by government regulation to have "[u]nder a thousand dollars" in the bank.

On March 13, 1998, a jury found Juliet not guilty of count I, Promoting a Dangerous Drug in the Third Degree (for the methamphetamine residue), guilty of count II, Unlawful Use of Drug Paraphernalia (for the scale), and guilty of count III, Promoting a Detrimental Drug in the Third Degree (for the marijuana). A judgment of guilty conviction and sentence was subsequently filed on June 23, 1998, pursuant to which Juliet was sentenced to five years' probation for count II and six months' probation for count III, to run concurrently.

This timely appeal followed.

## STANDARDS OF REVIEW

An appellate court will not overturn a conviction by a jury if "viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1992). Substantial evidence is defined as "credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *Id.*

## DISCUSSION

A. *The Conviction for Promoting a Detrimental Drug in the Third Degree Was Not Supported by Substantial Evidence*

1.

The offense of Promoting a Detrimental Drug in the Third Degree is committed if a person "knowingly possesses any marijuana ... in any amount." HRS § 712–1249(1).

In this jurisdiction, possession can be either actual or constructive. *State v. Mundell,* 8 Haw.App. 610, 617, 822 P.2d 23, 27–28 (1991). Constructive possession "reflects the common sense notion that an individual may possess a controlled substance even though the substance is not on his [or her] person at the time of arrest." *Id.* at 619, 822 P.2d at 28 (quoting *United States v. Disla,* 805 F.2d

1340, 1350 (9th Cir.1986). It "expand[s] the scope of possession statutes to encompass those cases where actual possession at the time of arrest cannot be shown but where the inference that there has been actual possession is strong." *Commonwealth v. Jackson,* 540 Pa. 556, 659 A.2d 549, 553–54 (1995) (quotation marks omitted).

"To support a finding of constructive possession the evidence must show 'a sufficient nexus between the accused and the drug to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug.' Mere proximity is not enough." *Mundell,* 8 Haw. App. at 622, 822 P.2d at 29 (citations omitted).

Factors that have been considered by other courts as inferring a nexus between a defendant and the drugs found include:

1) the defendant's ownership of ... or right to possession of the place where the controlled substance was found; 2) the defendant's sole access to the [place where the controlled substance was found]; 3) defendant under the influence of narcotics when arrested; 4) defendant's presence when the search warrant executed; 5) the defendant's sole occupancy of the [place where the controlled substance was found] at the time the contraband is discovered; 6) the location of the contraband ...; 7) contraband in plain view; 8) defendant's proximity to and the accessibility of the narcotic; 9) defendant's possession of other contraband when arrested; 10) defendant's incriminating statements when arrested; 11) defendant's attempted flight; 12) defendant's furtive gestures; 13) presence of odor of the contraband; 14) presence of other contraband or drug paraphernalia, not included in the charge; 15) place drugs found was enclosed.

*Wallace v. State,* 932 S.W.2d 519, 524 n. 1 (Tex.App.1995). Other factors that have been deemed relevant include "the consistent presence of known narcotics users on the premises[,]" *State v. Brown,* 80 N.J. 587, 404 A.2d 1111, 1119 (1979); the large quantity of drugs found, *id.;* the presence of large sums of money, *State v. Steward,* 844 S.W.2d 31, 33, 35 (Mo.App.1992); the fact that the de-

fendant had previously sold drugs, *Dodson v. State,* 213 Md. 13, 130 A.2d 728 (1957), or used drugs, *State v. Harris,* 159 Conn. 521, 271 A.2d 74 (1970), *cert. dismissed,* 400 U.S. 1019, 91 S.Ct. 578, 27 L.Ed.2d 630; and the fact that the drugs were found among the defendant's personal belongings. *State v. Baxter,* 285 N.C. 735, 208 S.E.2d 696 (1974).

While the foregoing factors are helpful in the abstract in evaluating whether constructive possession exists in a particular factual situation, they are far more difficult to apply in cases such as this one, where a defendant does not have exclusive possession or control of the place where drugs are found and no drugs are found on the defendant's actual person. As the Indiana Court of Appeals pointed out in *Moore v. State,* 613 N.E.2d 849, 851 (Ind.Ct.App.1993),

[i]n the case of simple possession:

" '[M]erely being or having been present in a place where marijuana is found is not sufficient proof that such person is in possession of the drug where he is not in exclusive possession of the place.' "

The reason is that normally, without more, no "natural probative force" can be placed upon mere presence at a place where narcotics are found. One could just as easily be present innocently as guiltily. Although evidence of presence would certainly be relevant, it alone would not be sufficient to sustain a conviction.

(Citations omitted.)

▄▄▄ In situations where a defendant does not have exclusive possession or control of the place where drugs are found, therefore, it is necessary for the State to show facts that would permit "a reasonable mind to conclude that [the] defendant had the intent and capability to exercise control and dominion over the drugs." *State v. Carr,* 122 N.C.App. 369, 470 S.E.2d 70, 73 (1996). That is, the evidence "must raise a reasonable inference that the defendant was engaged in a criminal enterprise and not simply a bystander." *State v. Fox,* 709 P.2d 316, 320 (Utah 1985). Proof of the defendant's knowledge of the presence of drugs and the defendant's ownership or right to possession of the place where the drugs were found, alone, are

insufficient to support a finding of the exercise of dominion and control. Other incriminating circumstances must be present to buttress the inference of knowing possession and provide the necessary link between a defendant and illegal drugs.

### 2.

█ In this case, the record reflects that Juliet was not in actual physical possession of the marijuana when it was seized. The dispositive issue, then, is whether substantial evidence was adduced at trial from which the jury could reasonably infer that Juliet had constructive possession of the marijuana.

We conclude that there was substantial evidence that Juliet had the *power* to exercise control and dominion over the marijuana. The marijuana was found in a drawer in the bedroom dresser that Juliet shared with Richard. Richard testified that Juliet washes, folds, and puts the clothes away and that she would see anything in the drawer. He also testified that on December 16, 1995, the date of the arrest, the marijuana had been in the dresser drawer for two months. Additionally, Juliet admitted that she had seen the marijuana in the drawer and knew what it was because, in the past, she had seen her uncle smoke marijuana, which looks "like the papaya leaves[.]"

We conclude, however, that there was insufficient evidence in the record that Juliet had the necessary *intent* to exercise control and dominion over the marijuana. The case of Plaintiff–Appellee State of Hawaiʻi (the State) against Juliet consisted essentially of evidence that she: resided in the apartment where the marijuana was found; was present when the search warrant was executed; had knowledge of the presence of the marijuana in the drawer; and had the power and capability of exercising control and dominion over the marijuana. The foregoing evidence, standing alone, does not support an inference that Juliet intended to exercise dominion and control over the marijuana.

Richard and Juliet both testified that Juliet strongly opposed Richard's use of drugs, did not procure the marijuana, and never smoked marijuana. A photograph offered into evidence indicated the presence of male clothing in the dresser drawer in which the marijuana was found, supporting Richard's and Juliet's testimonies that the drawer was Richard's. The marijuana was found in a closed fishing tool box, and Juliet testified that when she put Richard's clothes in the drawer, she just placed them on top of the box. When Juliet was asked whether she could have taken the packet of marijuana from the drawer and thrown it away, she replied, "No. I don't know because I just live over there. But if cannot find it, he going get mad. To him, that's his one. And I going throw away?"

The evidence also indicates that when police arrived to execute the search warrant, Juliet let them in and sat on the couch while they conducted their search. She did not engage in any furtive or suspicious conduct or make any incriminating statements, but was cooperative with them throughout their search. Furthermore, the amount of marijuana found in the drawer weighed less than a gram, and with the exception of the scale with a residue of methamphetamine in its bowl, no other contraband was found in the apartment.

In light of the evidence in the record, we cannot conclude that a nexus between Juliet and the marijuana can be inferred.

### B. *The Conviction for Unlawful Use of Drug Paraphernalia Was Not Supported by Substantial Evidence*

█ The offense of Unlawful Use of Drug Paraphernalia is defined in HRS § 329–43.5(a) as follows:

> It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

In other words, to commit the offense, a person must either use, or possess with intent to use, drug paraphernalia for certain purposes set forth in HRS § 329–43.5(a). The term "drug paraphernalia" is further defined in HRS § 329–1 (1993), in relevant part, as follows:

"Drug paraphernalia" means all equipment, products, and materials of any kind which are used, intended for use, or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of this chapter. It includes, but is not limited to:

. . . .

(5) Scales and balances used, intended for use, or designed for use in weighing or measuring controlled substances;

. . . .

In determining whether an object is drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors, the following:

. . . .

(6) Direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to a person or persons whom the owner or person in control knows, or should reasonably know, intend to use the object to facilitate a violation of this chapter; the innocence of an owner, or of anyone in control of the object, as to a direct violation of this chapter shall not prevent a finding that the object is intended for use, or designed for use as drug paraphernalia[.]

In this case, there was no evidence that Juliet "used" the scale for any of the prohibited purposes set forth in HRS § 329–43.5(a). For Juliet to be convicted of said offense, therefore, it was incumbent upon the State to prove, beyond a reasonable doubt, that Juliet "possessed" the scale "with intent to use" it for any of the purposes listed in HRS § 329–43.5(a).

Regarding the element of possession, Juliet denied any knowledge of the presence of the scale in the apartment. However, Richard testified that Juliet cleaned the apartment and "might have put [the scale] away" in the cleaning process.

Richard also admitted that he used the scale to weigh the drugs he sold and bought and that Juliet knew that he used and sold drugs and that some of the money he was giving her each month was from his drug sales. There was thus substantial evidence from which a reasonable jury could conclude that Juliet had the *power* to exercise control and dominion over the scale and was aware of the existence of the scale and its use by Richard for illegal purposes.

However, there was no evidence to show a sufficient nexus between Juliet and the scale to permit an inference that Juliet had the *intent* to exercise dominion and control over the scale. The testimony at trial revealed that the scale was found in a covered jack-o-lantern bucket with a cut-out opening, along with Richard's driver's license. There was no evidence that any of Juliet's belongings were found in the bucket, and the amount of methamphetamine found in the scale's bowl was so small that the jury acquitted Juliet of possessing the methamphetamine. Except for the small packet of marijuana found in the closed fishing tool box in the dresser drawer, no other drugs were found in the apartment or on Juliet's person. Juliet also did not make any incriminating statements or furtive gestures when arrested.

Moreover, there is no evidence in the record that Juliet intended to use the scale for any of the following prohibited purposes listed in HRS § 329–43.5(a): "to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter." Therefore, the "intent to use" element of the Unlawful Use of Drug Paraphernalia offense was not established.

In *Spanish Fork City v. Bryan,* 975 P.2d 501 (Utah App.1999), a case factually similar to the instant case, the Utah Court of Appeals reversed, for insufficient evidence, a wife's conviction for possession of drug paraphernalia, in violation of Utah Code Ann. § 58–37a–5(1) (1996),[5] a statute which appears to be identical to HRS § 329–43.5(a) in pertinent respects. In *Bryan,* the police, pursuant to a warrant, searched the residence which defendant wife occupied with her husband, seized drug paraphernalia,[6] and arrested the wife for possession of drug paraphernalia. No residue of any controlled substance was found on any of the drug paraphernalia items seized by the police. Moreover, the wife was not present at the time the search was conducted. Therefore, her conviction rested on the "possess with intent to use" portion of the statute.

Initially, the Utah court held that the state, in order to prove its case, was required to "(1) show that defendant was in possession of the items seized from the residence she shared with her husband and (2) prove that defendant intended to use the items seized as drug paraphernalia." *Id.* at 503. The court noted that

> [a]lthough defendant most certainly knew of the existence of the items and their potential for illegal use, *knowledge and ability to possess do not equal possession where there is no evidence of intent to make use of that knowledge and ability.* Thus, the evidence must raise a reasonable inference that ... defendant was engaged in a criminal enterprise and not simply a bystander.

*Id.* (emphasis added; citations, quotation marks, and brackets omitted).

In analyzing whether, under the totality of the circumstances, the evidence raised a reasonable inference that the defendant was engaged in a criminal enterprise, the Utah court examined several factors, including the following:

> 1) defendant's presence at the time the [drug paraphernalia] were found, with emphasis on the fact that the [drug paraphernalia] were in plain or open view; 2) the defendant's access to the [drug paraphernalia]; 3) the proximity of defendant to the [drug paraphernalia]; 4) evidence indicating that the defendant was participating with others in the mutual use and enjoyment of the contraband; and 5) incriminating statements.

975 P.2d at 503 (quotation marks omitted). Applying the foregoing factors to the facts in *Bryan,* the court observed:

> First, defendant was not present at the time the items were found. Second, *although defendant may have had access to the items found in her home, there was no evidence that she used or intended to use the items for illegal purposes. Third, there was no evidence that defendant participated in the mutual use of the items seized.* Lastly, defendant made no statements, incriminating or otherwise. We agree with defendant's argument that *the fact she lived in a house with her husband where the items were found is as fully explained by her attachment to her husband as it might be by a control over the items seized.*

*Id.* at 503–04 (emphases added; quotation marks omitted). The court concluded:

> Although circumstantial evidence may be enough to prove constructive possession, the [s]tate has the burden of estab-

---

5. The relevant portion of Utah Code Ann. § 58–37a–5(1) (1996), quoted by the Utah Court of Appeals in *Spanish Fork City v. Bryan,* 975 P.2d 501 (Utah App.1999), is as follows:
   > It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, ... process, prepare, ... inject, ingest, inhale or otherwise introduce a controlled substance into the human body in violation of this chapter.
   *Bryan,* 975 P.2d at 503.

6. The items seized in the search included a roach clip, scissors, clippers, zig-zags (papers used to roll cigarettes), and "antique" prescription pill bottles dated from 1968 to 1978. Also found were hypodermic needles, hemostats, and a photograph of six men, including defendant's husband, in which two of the men were smoking a bong. The hypodermic needles were found beneath the mattress of the bed defendant shared with her husband. All other items were openly displayed and in plain view of the investigating officers. *Id.* at 502.

lishing beyond a reasonable doubt that defendant committed each element of the crime charged. In cases relying on constructive possession, that burden requires a presentation of extensive and detailed facts.... Here, the necessary nexus between defendant and the items seized does not exist....

... Even accepting that the items seized are commonly used in the "drug world" for various purposes and that some of the items may indeed be paraphernalia, defendant's conviction for possession of paraphernalia "is based solely on inferences that give rise to only remote or speculative possibilities of guilt." "There must be some additional nexus between the accused and the items seized to show that the accused had the power and intent to exercise dominion and control over them." Because the nexus between defendant and the items is lacking, there is simply "not a sufficient quality or quantity of evidence" to support a determination that defendant was in possession of drug paraphernalia.

975 P.2d at 504 (citations and brackets omitted).

The Utah court's reasoning is persuasive. Based on our review of the record in this case, we similarly conclude that there was insufficient evidence to support the jury's verdict that Juliet possessed the scale with the intent to use it for any of the purposes articulated in HRS § 329–43.5(a).

## CONCLUSION

For the reasons stated above, we reverse the June 23, 1998 Judgment convicting and sentencing Juliet for Unlawful Use of Drug Paraphernalia, in violation of HRS § 329–43.5(a), and Promoting a Detrimental Drug in the Third Degree, in violation of HRS § 712–1249.

In light of our reversal of Juliet's conviction for Unlawful Use of Drug Paraphernalia, we need not decide whether the jury's verdict convicting Juliet of this charge was inconsistent with its verdict acquitting Juliet of Promoting a Detrimental Drug in the Third Degree (for the methamphetamine residue found in the scale).

### Concurring Opinion of ACOBA, J.

I agree with reversal of the convictions of Defendant–Appellant Juliet Moniz (Defendant), but disagree with the majority's conclusion that there was substantial evidence she had the power to exercise control and dominion over the marijuana.

Hawai'i Revised Statutes (HRS) § 712–1249(1) (1993) prohibits possession of marijuana in any amount. Possession must be a voluntary act. HRS § 702–201 (1993). " 'Voluntary act' means a bodily movement performed consciously or habitually as the result of the effort or determination of the defendant." Id. Under our penal code, "[p]ossession is a voluntary act [only] if the defendant knowingly procured or received the thing possessed or if the defendant was aware of the defendant's control of it for a sufficient period to have been able to terminate the defendant's possession." HRS § 702–202 (1993). After the passage of the Hawai'i Penal Code (HPC) in 1973, I consider the relevant definition of possession is that which is set forth in the HPC. See State v. Auwae, 89 Hawai'i 59, 62, 968 P.2d 1070, 1073 (App.1998) (holding that possession is a prosecutable act under the definition in HRS § 702–202). While the possession instructions given by the court did not constitute harmful error in this case, I believe an analysis of a possession crime should proceed from the definition set forth in HRS § 702–202. Id. at 62–63, 968 P.2d at 1073–74.

The majority concludes that a reasonable jury could infer that Defendant had control and dominion over the marijuana because the marijuana was discovered in a drawer of a bedroom dresser that defendant shared with her husband; Defendant washed, folded, and placed clothes in the drawer; by the date of arrest the marijuana had been in the drawer for two months; and Defendant admitted she saw the marijuana there. Nothing in these facts satisfies the definition of possession binding on us. There is no evidence to indicate Defendant procured or received the thing possessed or that she had control of it.

It is uncontroverted that Defendant did not procure the marijuana or receive it. Defendant was not in physical possession of the

marijuana when it was seized. The question then, is whether Defendant had "control" of the marijuana by virtue of the facts above. HRS § 702–202 is based upon Model Penal Code (MPC) § 2.01 (1962). The MPC commentary states in part that "control" includes the ability to terminate such control:

> An actor who is aware of his [or her] control of the thing possessed for a period that would enable him [or her] to terminate control has failed to act in the face of a legal duty imposed by the law that makes his [or her] possession criminal.

*Model Penal Code and Commentaries* § 2.01 comment 4 at 224 (Official Draft and Revised Comments 1985). *Black's Law Dictionary* 329 (6th ed.1990) defines the verb form of "control" as, in part, "[t]o exercise restraining or directing influence over[;] ... govern." Similarly, *Webster's Third New International Dictionary* 496 (1981) defines control as "to exercise restraining or directing influence over something[.]"

The facts relied upon by the majority demonstrate only that Defendant had equal access to the drawer because she shared the dresser with her husband. As wife, Defendant had joint use of the drawer. But in light of her marital relationship, Defendant's equal access to and joint use of the dresser do not logically lead to the determination that Defendant had control over the *marijuana* found within it. The facts are consistent with Defendant's marital status and without more, only serve to confirm that status.

Indeed, to infer more is to infer from the marriage status itself that Defendant had control over, and therefore possession of the *marijuana.* Such an inference lacks a ra-tional basis and is akin to the impermissible inference of guilt drawn from mere presence at the scene of a crime or mere association with a guilty party. *See State v. Yabusaki,* 58 Haw. 404, 408, 570 P.2d 844, 846 (1977) (explaining that the defendant's presence at the crime scene alone was insufficient to establish criminal intent in the absence of additional evidence); *State v. Medeiros,* 1 Haw.App. 536, 537, 621 P.2d 986, 988 (1981) (stating "guilt by association is not and has never been recognized as a tactic available to the prosecution"). There was no evidence that demonstrated Defendant exercised restraining or directing influence over the marijuana discovered in the drawer.

The fact that money given Defendant by her husband was from the sale of drugs would not establish a nexus with control over the marijuana. The question is not whether Defendant knew of her husband's sale of other drugs; the question is whether under the evidence she was guilty of the voluntary act of marijuana possession as "possession" is defined under the penal code.

From the record I do not believe that we can conclude a reasonable person exercising caution would reach the conclusion that Defendant exercised such restraining or directing influence over the marijuana so as to be subject to the legal obligation to end any purported control over it.