121 P.3d 911

STATE of Hawai'i, Plaintiff–Appellee,

v.

Jobert Lyle MALDONADO, Defendant–Appellant,

and

Kevin Wayne Anthony and Wendy Ualani, Tomiko Okimoto, Defendants.

No. 25606.

Intermediate Court of Appeals of Hawai'i.

June 6, 2005.

**448**

Curtis E. Sherwood for defendant-appellant.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee.

BURNS, C.J., AND FOLEY, J.; AND NAKAMURA, J., DISSENTING.

1. The Honorable Victoria S. Marks presided.

2. Hawaii Revised Statutes (HRS) § 712–1241 (Supp.2001) provides in relevant part:

> **§ 712–1241 Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
>
> . . . .
>
> (d) Manufactures a dangerous drug in any amount[.]
>
> (2) Promoting a dangerous drug in the first degree is a class A felony.
>
> (3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the first degree under this section involved the possession, distribution, or manufacture of methamphetamine, or any of its salts, isomers, and salts of isomers, the person convicted shall be sentenced to an indeterminate term of imprisonment of twenty years with a mandatory minimum term of imprisonment, the length of which shall not be less than one year and not greater than ten years, at the discretion of the sentencing court for a conviction under subsection (1)(a), (1)(b), or (1)(c) and not less than ten years for a conviction under subsection (1)(d). The person convicted shall not be eligible for parole during the mandatory term of imprisonment.

3. HRS § 712–1243 (1993 & Supp.2001) provides:

> **§ 712–1243 Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.
>
> (2) Promoting a dangerous drug in the third degree is a class C felony.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Jobert Lyle Maldonado (Maldonado) appeals from the Judgment filed on January 24, 2003 in the Circuit Court of the First Circuit (circuit court).[1] A jury found Maldonado guilty of Count I, Promoting a Dangerous Drug in the First Degree in violation of Hawaii Revised Statutes (HRS) § 712–1241(1)(d) (Supp.2001)[2]; Counts II and III, Promoting a Dangerous Drug in the Third Degree in violation of HRS § 712–1243 (1993 & Supp.2001)[3]; Count IV, Unlawful Use of Drug Paraphernalia in violation of HRS § 329–43.5(a) (1993)[4]; and Count V, Promoting a Dangerous Drug in the Second Degree in violation of HRS § 712–1242(1)(b)(i) (1993 & Supp. 2001).[5]

On appeal, Maldonado contends the circuit court erred by (1) denying his Motion to

> (3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

4. HRS § 329–43.5(a) (1993) provides as follows:

> **§ 329–43.5 Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

5. HRS § 712–1242(1)(b)(i) (1993 & Supp.2001) provides in relevant part:

> **§ 712–1242 Promoting a dangerous drug in the second degree.** (1) A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly:
>
> . . . .
>
> (b) Possesses one or more preparations compounds, mixtures, or substances of an aggregate weight of:

Suppress Evidence, filed August 7, 2002; (2) failing to declare a mistrial because the State violated the court's in limine order by using improper pronouns, the Prosecutor made improper remarks in his rebuttal argument, and Maldonado was denied his right to confront a witness; (3) denying Maldonado's motions for judgment of acquittal; (4) failing to dismiss Count II as a de minimis infraction; and (5) failing to instruct the jury regarding the fingerprint evidence. Because we agree with Maldonado's first contention that the circuit court erred in denying his Motion to Suppress Evidence, we vacate and remand.

## I.

On June 25, 2002, the State charged Maldonado with five counts relating to contraband. Maldonado filed his Motion to Suppress Evidence (Motion to Suppress) on August 7, 2002, asking that "all evidence obtained as a result of an illegal seizure and search of the Defendant's residence" be suppressed. Hearings on the motion took place on August 22, September 5, and September 16, 2002.

At the hearings, Deputy Sheriff Cayetano (Cayetano) testified that on June 10, 2002 he was contacted by the Honolulu Police Department (HPD) regarding a tip HPD had received on the whereabouts of one of Hawai'i's most wanted fugitives, Robert Maldonado (Robert), Maldonado's brother. The tipster provided information that Robert was at Maldonado's home and that firearms and drugs might be present. Police officers, including Officer Yosemori (Yosemori) and Officer Pagan (Pagan), went to Maldonado's residence to assist Cayetano in executing the arrest warrant for Robert. Based on Rob-

ert's status as "most-wanted," the officers were armed and had on bullet-proof vests. The officers approached the house, and Cayetano could see that the lights were on, the exterior screen door was closed, and the interior wooden door was open.

Cayetano had his gun unholstered and to his side. Cayetano testified that he simultaneously knocked on and opened the screen door and "announced, 'Sheriff's Office, Police.'" It was only after Cayetano knocked and opened the screen door that he asked if he could enter and stated that he had a "retake warrant." Cayetano testified when he opened the screen door, he looked into the house and it was possible that a portion of his upper body crossed the threshold of the house, but he did not enter the house. After Cayetano opened the door, he saw Maldonado, Wendy Okimoto (Okimoto), and Kevin Wayne Anthony (Anthony)[6] in a back room. The three individuals in the back room looked in the direction of the officers.

Cayetano testified that he said "Sheriff's Office, police; is Robert here?" and Maldonado said "No." Cayetano testified that he asked, "Do you mind us coming in? We're looking for Robert," and Maldonado said, "Yeah, yeah, yeah." The officers then entered the house. Cayetano asked Maldonado if he was the owner of the place, and Maldonado said yes. Cayetano testified that he instructed Maldonado, Okimoto, and Anthony to exit the house for safety reasons and wait outside with other police officers; Maldonado, Okimoto, and Anthony left the house.

Yosemori testified that he knocked on the screen door, saw the screen door was unlocked, and then opened the screen door while announcing "Police and sheriffs." Yo-

---

(i) one-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

. . . .

(2) Promoting a dangerous drug in the second degree is a class B felony.

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the second degree under this section involved the possession or distribution of methamphetamine, or any of its salts, isomers, and salts of isomers, the person convicted shall be sentenced to an indeterminate

term of imprisonment of ten years with a mandatory minimum term of imprisonment, the length of which shall be not less than six months and not greater than five years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

6. Co-defendants Wendy Okimoto and Kevin Wayne Anthony were charged with the same first four counts as Jobert Maldonado (Maldonado), but they were acquitted of all counts.

semori testified that he opened the screen door because he could see people in the house through the screen door, but did not "have a good picture" of their movements, "like if anyone might have been pulling out a weapon or something." Yosemori stated that the screen door opened outward and he had his back against the door holding it open and had one foot on the platform in front of the door and one foot on the doorsill. Yosemori had his weapon out, but he was holding it down toward the ground. Yosemori testified that Cayetano told the people to come out of the room, and Yosemori asked if Robert was there. Maldonado said no. Yosemori asked who lived there, and Maldonado said he did. Yosemori asked Maldonado if he was Robert's brother, and Maldonado said yes. Yosemori testified that Cayetano asked if they could go inside and look for Robert, and Maldonado said "yeah."

Yosemori testified that he entered the house first and went into the closest room, but found no one in the room. He then went to the back room from which Maldonado, Okimoto, and Anthony had exited. Yosemori noticed that "right out in the open in the middle of the floor" there were three glass pipes with residue inside. Based on Yosemori's experience and training, he believed the pipes were used to smoke methamphetamine. Yosemori also found a glass dish with some crystal substance inside, a can of acetone, and a box of baking soda. Following procedure, Yosemori notified the narcotics division clandestine lab team.

Pagan testified that six or seven officers approached the house. The officers secured the perimeter of the house, and Pagan, Cayetano, and Yosemori went to the front door. As the officers approached the house, Pagan was holding a shotgun towards the house. While he was standing behind Cayetano and Yosemori at the front door, he held the shotgun pointed downward. Pagan testified that when Cayetano asked Maldonado if Robert was there, Maldonado answered no. Cayetano then asked Maldonado if they could "make entry into the residence to make sure that [Robert] wasn't there." Yosemori asked the same question. Pagan testified that he heard Maldonado answer yes to the officers'

questions. After the officers entered the house, Pagan raised his shotgun, but he did not point it at Maldonado, Okimoto, and Anthony. Pagan testified that firearms were found by the police "on the side of the house."

Maldonado testified that on June 10, 2002, he was with Okimoto and Anthony in a room in his house when he heard "one loud noise that said oh, everybody, get out of the room." He stated that by the time he came out from the back room, the police were "right inside my doorway already; in fact, they were pretty much inside my house." The police had their guns out and one officer had a rifle pointing in the general direction of Maldonado, Okimoto, and Anthony. Maldonado claimed he felt threatened and scared because of the presence of the police and their firearms, even though no one made any verbal threats. Maldonado testified that when the police asked whether they could look for Robert, Maldonado said "I guess" or "yeah," agreeing with the request.

The circuit court denied Maldonado's Motion to Suppress and issued its "Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion to Suppress Evidence" on November 12, 2002. The circuit court's Findings of Fact and Conclusions of Law were as follows:

### FINDINGS OF FACT

1. On June 10, 2002, the Department of Public Safety and the Honolulu Police Department acted on a tip that a parole violator, Robert Maldonado (defendant JOBERT MALDONADO's brother) was currently at an apartment at 1704A Apaki Street.

2. A Sheriff's deputy and Honolulu Police Department officers were in possession of an arrest warrant authorizing them to arrest Robert Maldonado; and when the officers went to that address they confronted defendant JOBERT MALDONADO.

3. According to the information given to the officers, firearms were purported to be present at the premises where Robert Maldonado had been reported,

which was defendant JOBERT MAL-
DONADO's residence.

4. When they approached the premises where Robert Maldonado was reported to be, one or more officers knocked on the door, announced their presence and office (both the police and the sheriff) and demanded entry; then one or more officers partially entered the front door of defendant MALDONA-DO's residence, by opening ·a screen door outward and crossing the threshold with part of one officer's body.

5. The wooden interior door had been open before the officers arrived at the premises, and the officers could see through the screen door to the interior of the residence before opening the screen door.

6. The officers asked defendant JOBERT MALDONADO if Robert Maldonado was present, but when defendant MALDONADO told them Robert was not there, the officers asked to check the premises anyway.

7. Defendant MALDONADO gave the officers permission to check the premises at which time the officers entered, and once inside they saw what appeared to be a "clandestine lab" used for the production of methamphetamine.

8. Also observed within the residence were the two other co-defendants, KEVIN WAYNE ANTHONY and WENDY UALANI TOMIKO OKIMO-TO, who had both exited the room where the purported clandestine lab was found.

## CONCLUSIONS OF LAW

1. The officers who approached defendant MALDONADO were in compliance with § 804–11[sic] HRS requirements to knock and announce their office, and demand entry before forcibly entering the premises to execute a warrant of arrest. See e.g. *State v. Harada,* 98 Hawai'i 18, 41 P.3d 174 (2002).

2. In addition to satisfying the "Knock and Announce" rule, the officers in this case also obtained permission from de-

fendant JOBERT MALDONADO to enter the premises to search for Robert Maldonado.

3. Even if the officers had not met the requirements of the "Knock and Announce" rule, the officer's [sic] knowledge of the possible presence of firearms on the premises constituted an exigent circumstance justifying entry into the residence.

4. Concerning discovery of equipment suspected of being a so-called "clandestine lab" and other contraband observed by the officers, once the officers were properly in the residence, observation of these materials was proper and allowable as the evidence was in "open view." *State v. Stachler,* 58 Haw. 412, 570 P.2d 1323 (1977).

## II.

### A. Motion to Suppress Evidence

 Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard. Furthermore ... the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own Fourth Amendment rights were violated by the search and seizure sought to be challenged. The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence. *State v. Balberdi,* 90 Hawai'i 16, 20–21, 975 P.2d 773, 777–78 (App.1999) (quoting *State v. Anderson,* 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997)).

 Consequently, we "review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was

**452**

'right' or 'wrong' " as a matter of law. *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997). When

> a defendant's motion to suppress evidence is denied prior to trial, the defendant need not object at trial to the introduction of the evidence to preserve his or her right to appeal the pretrial denial of his or her motion to suppress and the introduction of the evidence at trial.

*State v. Kong,* 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App.1994) (citation omitted). Further, when

> the defendant's pretrial motion to suppress is denied and the evidence is subsequently introduced at trial, the defendant's appeal of the denial of the motion to suppress is actually an appeal of the introduction of the evidence at trial. Consequently, when deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial.

*Id.* (citations omitted).

**B. Motion for a Judgment of Acquittal**

▮ The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. An appellate court employs the same standard of review.

*State v. Keawe,* 107 Hawai'i 1, 4, 108 P.3d 304, 307 (2005) (brackets omitted) (quoting *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)).

**III.**

**A. Motion to Suppress**

▮ The circuit court erred when it concluded that the "officers who approached defendant MALDONADO were in compliance with § 804–11[sic] HRS requirements to knock and announce their office, and demand entry before forcibly entering the premises to execute a warrant of arrest. See e.g.

*State v. Harada,* 98 Hawai'i 18, 41 P.3d 174 (2002)."

Hawaii Revised Statutes § 803–11 (1993) provides:

> **§ 803–11 Entering house to arrest.** Whenever it is necessary to enter a house to arrest an offender, and entrance is refused, the officer or person making the arrest may force an entrance by breaking doors or other barriers. *But before breaking any door,* the officer or person *shall first demand entrance* in a loud voice, and *state that the officer or person is the bearer of a warrant of arrest;* or if it is in a case in which arrest is lawful without warrant, the officer or person shall substantially state that information in an audible voice.

(Emphasis added.)

The circuit court found that "one or more officers knocked on the door, announced their presence and office (both the police and the sheriff) and demanded entry; then one or more officers partially entered the front door of defendant MALDONADO's residence, by opening a screen door outward and crossing the threshold with part of one officer's body."

There is no question there was a "breaking" of the door under HRS § 803–11. As stated in *State v. Harada,* 98 Hawai'i 18, 41 P.3d 174 (2002):

> Although a breaking "connotes some use of force," that force may be no more than that required to turn a doorknob. *See* [*State v. Dixon,* 83 Hawai'i 13, 18, 924 P.2d 181, 186 (1996) ] (stating that "[a]n unannounced intrusion into a dwelling ... is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or ... open a closed but unlocked door.")

*Id.* at 22, 41 P.3d at 178 (brackets in original and ellipses omitted).

There was no finding of fact by the circuit court nor any evidence that any officer stated that the officer was "the bearer of a warrant of arrest" "before breaking any door" as required by HRS § 803–11. This requirement should not be treated lightly as the

Hawai'i Supreme Court stated in *State v. Dixon*, 83 Hawai'i 13, 924 P.2d 181 (1996): "The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given a grudging application." *Id.* at 17, 924 P.2d at 185 (brackets omitted) (quoting *Miller v. United States*, 357 U.S. 301, 313, 78 S.Ct. 1190, 1198, 2 L.Ed.2d 1332 (1958)).

Cayetano testified that he opened the screen door while he was knocking on the door. It was only after Cayetano knocked and opened the screen door did he ask if he could enter and stated that he had a "retake warrant." Yosemori testified he knocked on the door, opened the door, and then announced his presence.

Not only did the officers fail to state they were bearers of an arrest warrant before "breaking" the screen door, they failed to wait a "reasonable time" after demanding entrance before "breaking" the door and crossing the threshold. *State v. Garcia*, 77 Hawai'i 461, 466–67, 887 P.2d 671, 676–77 (App.1995) (ten-second delay between announcement and forced entry was insufficient); *State v. Diaz*, 100 Hawai'i 210, 221, 58 P.3d 1257, 1268 (2002) (fifteen-second delay after police knocked and announced their presence and authority and before police entered was sufficient). The officers did not satisfy the "knock and announce" rule nor did they comply with the requirements of HRS § 803–11. The circuit court's conclusions of law to the contrary were erroneous:

■ The circuit court's second conclusion of law that "the officers in this case also obtained permission" from Maldonado "to enter the premises" is also in error. By "breaking" the screen door and crossing the threshold, the officers had already entered the premises before asking permission of Maldonado. Maldonado's response of "Yeah, yeah, yeah" to Cayetano's inquiry, "Do you mind us coming in? We're looking for Robert" (while Officers Cayetano, Yosemori, and Pagan stood with their weapons drawn in Maldonado's doorway) was, to the extent it can be construed as permission to enter and search, "the product of duress or coercion, express or implied" as opposed to consent

voluntarily given. *State v. Trainor*, 83 Hawai'i 250, 261, 925 P.2d 818, 829 (1996). The "number of officers present, the degree to which they emphasize their authority, and the display of weapons" were coercive factors comprising a "totality of the circumstances" indicating there was no voluntary consent given by Maldonado to enter and search his premises. *State v. Patterson*, 58 Haw. 462, 471, 571 P.2d 745, 751 (1977). These factors were not addressed in the circuit court's conclusion that Maldonado granted permission to the officers to enter and search his premises. Furthermore, any consent given by Maldonado was induced by the officers' prior illegal breaking and entering, in violation of HRS § 803–11, and was therefore invalid. *State v. Pau'u*, 72 Haw. 505, 509–10, 824 P.2d 833, 835–36 (1992).

■ The circuit court's third conclusion of law that "the officer's [sic] knowledge of the possible presence of firearms on the premises constituted an exigent circumstance justifying entry into the residence" is also in error. "[S]ufficient time existed to obtain a search warrant once the house had been secured.... Moreover, the record yields no indication that the ... decision to enter the house ... was prompted by any activity in the house[.]" *State v. Vinuya*, 96 Hawai'i 472, 489–90, 32 P.3d 116, 133–34 (App.2001). The possible presence of firearms on the premises did not require an immediate police response "to prevent imminent danger to life or serious damage to property, or to forestall the likely escape of a suspect or the threatened removal or destruction of evidence." *State v. Lloyd*, 61 Haw. 505, 512, 606 P.2d 913, 918 (1980). Maldonado's house had been secured by police officers, barring any escape by the suspect. There was no evidence that anyone or anything in the house was in imminent danger. The police response was not intended to prevent the removal or destruction of evidence (drugs or drug paraphernalia), but to arrest a suspect who was, in fact, not in the house of his brother, Maldonado.

■ The circuit court's fourth and final conclusion of law that the evidence seized was in "open view" was based on the errone-

ous conclusion that "the officers were properly in the residence" and therefore is in error.

Because the officers failed to follow the mandate of HRS § 803–11 and illegally entered Maldonado's home, the items seized as result of the illegal entry should have been suppressed. *Garcia,* 77 Hawai'i at 466, 887 P.2d at 676.

## B. Sufficiency of the Evidence/Judgment of Acquittal

 Maldonado contends the circuit court erred in denying his motions for judgment of acquittal because there was insufficient evidence to support any of the convictions.[7]

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting *State v. Quitog,* 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Richie,* 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted).

Maldonado points to *State v. Moniz,* 92 Hawai'i 472, 992 P.2d 741 (App.1999), where the ICA held that there was "no evidence to show a sufficient nexus between [defendant] and the scale to permit an inference that [defendant] had the *intent* to exercise dominion and control over the scale." *Id.* at 478,

992 P.2d at 747. However, the ICA also held that

> the defendant's knowledge of the presence of drugs and the defendant's ownership or right to possession of the place where the drugs were found, alone, are insufficient to support a finding of the exercise of dominion and control. Other incriminating circumstances must be present to buttress the inference of knowing possession and provide the necessary link between a defendant and illegal drugs.

*Id.* at 476–77, 992 P.2d at 745–46.

Maldonado denied knowledge of the drugs and paraphernalia. However, the contraband was found in open view in the back corner room, from which the officers witnessed Maldonado exit. Maldonado lived at the residence and had control of the house, he was witnessed exiting from the room in which drugs and contraband were found, a pipe was found in the back room with the initials "JM" on it, and methamphetamine was found in Maldonado's pants pocket. Therefore, considering the evidence in the light most favorable to the prosecution, substantial evidence existed to support all of the convictions, and the circuit court did not err in denying Maldonado's motions for judgment of acquittal.

Because we vacate and remand, it is unnecessary to address Maldonado's other points on appeal.

## IV.

Because we conclude the circuit court erred in denying Maldonado's Motion to Suppress Evidence filed August 7, 2002, we vacate the January 24, 2003 Judgment of the Circuit Court of the First Circuit and remand this case for further proceedings consistent with this opinion.

Dissenting Opinion by NAKAMURA, J.

## I.

I agree with the majority that the law enforcement officers did not comply with the

---

7. Maldonado asserts insufficient evidence to support "the convictions for all charges." However, Maldonado does not provide an argument with respect to Count V (Promoting a Dangerous Drug in the Second Degree). Therefore, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7), we do not need to address this claim because "points not argued may be deemed waived." If we were to address this claim, we would conclude there was sufficient evidence to support all convictions.

literal requirements of Hawaii Revised Statutes (HRS) § 803–11 (1993), the knock-and-announce statute for executing an arrest. The officers, however, *substantially complied*[1] with HRS § 803–11 given the policies underlying the statute. I would follow California precedents in holding that suppression of evidence is not warranted when there is substantial compliance with the knock-and-announce statute. *People v. Peterson,* 9 Cal.3d 717, 108 Cal.Rptr. 835, 511 P.2d 1187, 1191–92 (1973); *People v. Tacy,* 195 Cal. App.3d 1402, 241 Cal.Rptr. 400, 406–12 (1987); *People v. Hoag,* 83 Cal.App.4th 1198, 100 Cal.Rptr.2d 556, 561–65 (2000).[2] The California Supreme Court summarized the substantial compliance rule as follows:

When police procedures fail to conform to the precise demands of the [knock-and-announce] statute but nevertheless serve its policies we have deemed that there has been such substantial compliance that technical and, in the particular circumstances, insignificant defaults may be ignored.

*Peterson,* 108 Cal.Rptr. 835, 511 P.2d at 1192.

As the majority notes, under existing case law, the officers "broke" the unlocked screen door by opening it. In almost all knock-and-announce cases, the "breaking" of the door is immediately followed by the officers' entry into the residence. This case is unique in that the officers did not enter the residence of Defendant–Appellant Jobert Maldonado (Maldonado) after opening the screen door, but instead waited at the doorway. Indeed, the officers did not enter the residence until after they identified themselves as law enforcement officers, stated that they had a retake warrant for Maldonado's brother, and asked for and obtained permission from Maldonado to enter. This case therefore raises the question of whether the suppression of evidence is required based on the premature opening of an unlocked screen door where the officers otherwise satisfied the requirements of HRS § 803–11 *before* entering the residence. In my view, the suppression of evidence in these circumstances is not required.

HRS § 803–11 requires that an officer demand entrance and identify his or her authority before breaking into a house to effect an arrest. The statute provides:

§ 803–11 **Entering house to arrest.** Whenever it is necessary to enter a house to arrest an offender, and entrance is refused, the officer or person making the arrest may force an entrance by breaking doors or other barriers. But before breaking any door, the officer or person shall first demand entrance in a loud voice, and state that the officer or person is the bearer of a warrant of arrest; or if it is in a case in which arrest is lawful without warrant, the officer or person shall substantially state that information in an audible voice.

The purposes of HRS § 803–11 "are to: (1) reduce the potential of violence to both occupants and police resulting from an unannounced entry; (2) prevent unnecessary property damage; and (3) protect the occupant's right of privacy." *State v. Dixon,* 83 Hawai'i 13, 14, 924 P.2d 181, 182 (1996).

Under the circumstances of this case, the officers' conduct served the purposes of HRS § 803–11 and constituted substantial compliance with its requirements. First, there was no potential for violence due to an unannounced entry because the officers did not enter until they had announced their authority and received permission to enter. The officers knocked and identified themselves as the "Sheriff's Office" and "Police" while opening the screen door. The officers' conduct in opening the screen door (the "breaking") and waiting at the doorway served to reduce the potential for violence. Such conduct not only permitted the occupants to see

---

1. In orally denying the motion of Defendant–Appellant Jobert Maldonado (Maldonado) to suppress evidence, the trial court found that there was "substantial compliance with ... the knock-and-announce rule."

2. Courts in other jurisdictions have likewise applied a substantial compliance rule in determining whether knock-and-announce violations require suppression of evidence. *E.g., State v. Steingraber,* 296 N.W.2d 543, 545–46 (S.D.1980); *People v. Bernardo,* 89 Misc.2d 931, 392 N.Y.S.2d 1001, 1002–03 (N.Y.Sup.Ct.1977); *see also, Commonwealth v. McDonnell,* 512 Pa. 172, 516 A.2d 329, 330–31 (1986).

that the persons at the door were indeed law enforcement officers,[3] but allowed the officers to assure themselves that the occupants were not reaching for weapons.

Second, opening the unlocked screen door did not result in the destruction of any property.

Third, the officers could already see into the residence through the screen door. After opening the screen door, the officers did not enter the residence; they waited at the door until Maldonado gave them permission to enter. Any incremental infringement on Maldonado's privacy caused by the officers' opening the screen door was minimal. In addition, the officers' decision to open the screen door was motivated by legitimate concerns for their safety.

HRS § 803–11 is entitled "Entering house to arrest." The statute's title and language shows that it was directed at a situation where the officers' breaking of a door leads to their *gaining entry* into the house to effect an arrest. In this case, however, the officers waited at the doorway until they received Maldonado's consent to enter. Officer Yosemori testified that he stood in the doorway with one foot outside and one foot on the doorsill "no more than a couple inches inside the house." Deputy Sheriff Cayetano testified that he remained outside the house although a portion of his upper body may have leaned in and crossed the threshold.[4] The officers' conduct while waiting at the door did not constitute the type of entry into the house contemplated by the statute. The officers only entered the house after the demand and notice requirements of HRS § 803–11 had been satisfied and the officers had received consent from Maldonado to enter.

The facts of *Peterson* are illuminating. In *Peterson,* a police officer went to the defen-

dant's residence to execute a search warrant. 108 Cal.Rptr. 835, 511 P.2d at 1190. The inner door was open, but an unlocked screen door was closed. *Id.* The officer was able to see into the living area through the screen door and observed a man and woman seated and engaged in conversation. *Id.* The officer knocked several times but the occupants did not respond. *Id.* After waiting a minute, the officer opened the screen door, *then* identified himself, stated he had a warrant, and entered the residence. *Id.* (emphasis added).

The California Supreme Court noted that the officer's opening of the unlocked screen door constituted a "breaking" under the California knock-and-announce statute. *Id.* at 1191.[5] The officer had violated the statute by failing to provide notice of his authority and purpose *before* opening the screen door as required by the statute. *Id.* Nevertheless, the court held that the officer's technical violation of the statute by delaying his announcement until after he had opened the screen door had not contravened the purposes or policies of the knock-and-announce statute. *Id.* at 1192. The court concluded that the officer had substantially complied with the knock-and-announce statute and upheld the denial of the defendant's suppression motion. *Id.*

The circumstances of Maldonado's case are almost identical with the circumstances of *Peterson* regarding the timing of the screen door's opening and the officers' announcement. But unlike in *Peterson,* the officers in Maldonado's case waited outside until they received specific permission to enter. Thus, Maldonado's case presents stronger facts than *Peterson* for applying the substantial compliance rule.

3. The officers displayed badges and were dressed in protective gear bearing markings that clearly identified them as law enforcement officers.

4. Based on the testimony of Officer Yosemori and Deputy Sheriff Cayetano, the trial court found that "one or more of the officers *partially entered* the front door" of the residence after the screen door was opened. (Emphasis added). The court further found that the officers did not fully enter the residence until after Maldonado gave them permission to enter.

5. The California knock-and-announce statute considered in *People v. Peterson* provided, in relevant part, as follows:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice or his authority and purpose, he is refused admittance.

*Peterson,* 9 Cal.3d 717, 108 Cal.Rptr. 835, 511 P.2d 1187, 1190 n. 2 (1973).

## II.

Even if the officers' compliance with HRS § 803–11 is deemed not to be substantial or sufficient, suppression of the evidence is not warranted. Maldonado's valid consent to the search of his residence provided an independent basis for the lawful seizure of the evidence. Maldonado's consent to search included his giving the officers permission to enter his residence, and the officers did not enter the residence until they received Maldonado's consent to search. If the screen door had not been opened, the officers would still have asked for consent to search the residence since they were there to find Maldonado's brother, one of Hawai'i's most-wanted fugitives. Thus, Maldonado's consent to search was not the fruit of the officers' violation of the knock-and-announce statute.

I disagree with the majority's conclusion that Maldonado's consent to search was involuntary. "[W]hether consent to search has been given voluntarily is a question of fact to be determined by the trial court from the 'totality of all the circumstances.'" *State v. Patterson*, 58 Haw. 462, 468 571 P.2d 745, 749 (1977) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).) The trial court "is best situated to decide the question of voluntariness" and its findings "regarding the validity of consent to search must be upheld unless 'clearly erroneous.'" *Patterson*, 58 Haw. at 468–69, 571 P.2d at 749.[6]

Deputy Sheriff Cayetano testified that he did not make any threatening remarks and that "there was no duress at all" when he asked Maldonado for consent to enter the house and search for Maldonado's brother. Officer Pagan confirmed that no threats were made. The officers waited at the doorway and had not entered the house when they asked for Maldonado's consent. Although the officers were armed, they kept their guns pointed down and not in the direction of Maldonado while seeking his consent. Moreover, prior to obtaining Maldonado's consent, the officers advised Maldonado that they were there to look for his brother to execute a retake warrant. The officers' statement of their purpose explained the reason for their guns being drawn and served to dissipate the potential intimidating effect of Maldonado's seeing their weapons. The officers' statement of their purpose also informed Maldonado that he was not the focus of the officers' scrutiny. Given these circumstances, I would not overturn the circuit court's finding that Maldonado gave the officers permission to enter and search his residence.

## III.

In my view, the circuit court properly denied Maldonado's motion to suppress evidence. Accordingly, I respectfully dissent.

---

6. In Maldonado's motion to suppress evidence, Maldonado claimed that any consent to search he gave was coerced or given under duress. At the hearing in which the trial court orally denied Maldonado's suppression motion, Maldonado's counsel asked if the court was making a finding on the "issue of consent to enter when Mr. Maldonado was questioned or asked for permission to enter." The court responded that "if consent was needed, it was given." The trial court's written findings of fact do not use the word "consent" but state that "Defendant Maldonado gave the officers permission to enter to check the premises at which time the officers entered." I interpret this language as a finding by the trial court that Maldonado gave the officers valid consent to search.